BENJAMIN P. MONACELLI, Plaintiff, v. EUSTIS B. GRIMES, Defendant.

(*August* 5, 1953.)

SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and LAYTON, Judge, sitting.

*Stewart Lynch* for plaintiff.

*William Prickett* for defendant.

Supreme Court of the State of Delaware, No. 15, 1953.

No. 178, Civil Action, 1953, in the Superior Court in and for New Castle County.

SOUTHERLAND, C. J.:

The Superior Court of New Castle County has certified to us for answer, under Article IV, Section 11(9), of the Constitution, Del. C., certain questions of law arising out of the following facts:

In the court below plaintiff brought suit against defendant to recover damages for personal injuries suffered in an automobile accident that had occurred in the State of Delaware. Defendant was at the time of the accident and still is a resident of the State of Massachusetts. Complaint and *praecipe* were filed February 24, 1953, and the summons and complaint were served on the Secretary of State February 25. The writ was returned by the Sheriff March 10, 1953, and on that date a copy of the summons showing service thereof, together with a copy of the complaint and a letter from plaintiff's attorney, were sent to defendant by registered mail. Defendant thereafter moved to quash the service and dismiss the action on the ground that the service had not been made as required by law.

Paragraph 4590, *Revised Code of* 1935, provided that service of process upon nonresident motor vehicle operators involved in an accident in Delaware should be made by serving the process upon the Secretary of State and sending "forthwith" to the non-resident defendant by registered mail "a copy of the process with notice of such service".

In the *Code of* 1953, which became effective February 12, 1953, the language of this paragraph was changed to provide that there should be sent to the non-resident defendant by registered mail, "not later than the day following the commencement of the action a copy of the process and notice that service * * * has or will soon be made upon the Secretary of State". 10 *Del. C.* § 3112.

The service in this case was in accordance with the language of the 1935 *Code;* it did not conform to the language of the 1953 *Code.*

The Superior Court has certified to us four questions as follows:

"1. In enacting the *Delaware Code of* 1953, did the General Assembly of the State of Delaware intend to alter the procedure for service of process upon non-residents as set forth in Section 4590 of the *Revised Code of* 1935, to the method of service set forth in Title 10, Section 3112 of the *Delaware Code of* 1953?

"1A. What is the proper construction of Title 10, § 3112, of the *Delaware Code of* 1953, and the effect of its passage upon the procedure for service of process upon non-residents as set forth in § 4590 of the *Revised Code of* 1935?

"2. If the answer to the first question is in the affirmative, is the provision for service in Title 10, Section 3112 *Delaware Code of* 1953 applicable to causes of action which arose prior to its effective date?

"3. If the answer to both of the preceding questions is in the affirmative, is the title of the Act of the General Assembly by which the 1953 *Code* was adopted sufficient to meet the requirements of Article 2, Section 16 of the Delaware Constitution?"

We take up Question 1.

The Act of the General Assembly approved February 12, 1953, adopted a revision and codification of the public and general statutes of the State. *Del. C. Ann.,* vol. 2, p. 118. It was enacted as positive law. The circumstances of its preparation, submission, and passage are as follows:

By act approved June 30, 1949, Vol. 47, *Laws of Del.* Ch. 377, there was created The Revised Code Commission, consisting of three commissioners with appropriate qualifications to be appointed by the Governor. The Commission was authorized and directed "to revise, codify and arrange in a systematic and con-

densed form, all the statute laws of the State of Delaware of a public and general nature". Section 3. The Commission was to follow as nearly as possible the general scheme of the *Code of 1935*, "but in no case is the said Commission authorized to omit, add to, amend, alter, change or vary the meaning of any existing law to be embraced in said work." Section 4.

Section 5 of the act of 1949 provides:

"That the said Commission is authorized to omit enactments that are redundant and have ceased to have any effect on existing rights and remedies, to reject superfluous words, to condense into as concise and comprehensive form as is consistent with a full, clear and exact expression of the will of the Legislature, all circuitous, tautological and ambiguous phraseology, and in a separate report to be made to the next biennial session of the General Assembly, to suggest any mistakes, omissions, inconsistencies and imperfections that may appear in the laws to be revised, codified and arranged in accordance with the provisions of this Act, and the manner in which they may be corrected, supplied and amended by act of the General Assembly."

The Commission was directed to make full report of its work to the next biennial session of the General Assembly.

On January 1, 1951, the Commission submitted its report. Explaining certain difficulties it had met with, it recommended, among other things, that the time for the completion of the *Code* be extended until the next biennial session. In the course of its report the Commission said:

"In a project of this nature, there are three possible methods that may be followed:

"(1) The preparation of a compilation which is nothing more than the assembling or collation of the effective present statutes, as nearly as possible in the order in which they appear in the old code that is to be superseded, without changing the language of the statutes in any way that is not patently essential. This is what is generally meant by the term 'codification.'

"(2) The preparation of a revision and reformation proposing changes in the substance of the law according to the opinion of the draftsmen.

"(3) The preparation of a revision, properly speaking, in which manifest errors are corrected, obsolete, amended and repealed statutes eliminated, incongruities removed, and (to the extent that time and other circumstances permit) the law restated simply and understandably." (First Report to Legislature on Delaware Code Revision, p. 6.)

The Commission pointed out that the second method was not intended by the legislature and referred to the language of Section 4 of the act of 1949 forbidding it to change the meaning of any existing law.

The Commission expressed some doubt whether the first or third methods was intended by the legislature, but reported that after consideration it had determined upon the third method, believing that to be within the powers conferred by the act of 1949.

The Commission reported its basic policy to be as follows:

"The revision is not to be a mere compilation of existing laws. Neither is it to embody policy changes in the substance of the law." (First Report, p. 8.)

The Commission further reported that it had departed from the arrangement of the 1935 *Code*, and had adopted a system of titles characteristic of the *United States Code* and of other recent state codes.

The General Assembly, in evident approval of the Commission's report, amended the act of 1949 to carry out certain recommendations of the Commission, including the extension of time requested. See Vol. 48, *Laws of Del.*, Ch. 128. By an amendatory section 9 authority was in effect conferred upon the Commission to prepare a revision—not a mere compilation—, to eliminate obsolete and unconstitutional laws, to resolve incon-

gruities, and to integrate and synthesize statutes dealing with the same subject; but this authority was limited as before by a mandate that "in no case is the Commission authorized to omit, add to, amend, alter, change or vary the meaning of any existing law to be embraced in the work."

Having completed its work, the Commission submitted the *Revised Code* to the 1953 session of the General Assembly, together with a report dated December 31, 1952. *Del. C. Ann.*, vol. 2, p. IX. A section of the report, under the heading "*Nature and Extent of Revision of Statutes*", dealt with certain changes in the revision which were substantial in nature. The Commission reported that there had been omitted from the *Code* statutes which had been found to be obsolete, to have been fully executed, to have been superseded by later enactments, to be in conflict with court rules authorized by statute, or to have been declared unconstitutional. The Commission further reported:

"Incongruities and inconsistencies found in the statutes were resolved after a careful analysis of the statutes involved and with a conscientious effort to ascertain and effectuate the true legislative intent."

Changes made necessary by the reorganization of the courts resulting from the 1951 amendments to the judiciary article of the Constitution were referred to; and specific attention was called to revisions of the statutes relating to the jurisdiction of inferior courts in criminal cases.

The Commission then said:

"The Commission has made no changes in the substance or meaning of the law as it has existed heretofore, except those of the character mentioned above and which the Commission regarded as within the scope of its powers." (*Report of the Revised Code Commission*, p. 10.)

Thereafter the *Code* was duly adopted by the requisite vote of each house of the General Assembly and approved by the Governor.

■ From the foregoing outline of the background of the preparation and adoption of the 1953 *Code* it is clear that, except to the limited extent indicated in its report, the Code Commission had not intended to recommend, and it was not the purpose of the legislature to adopt, any changes in substantive law. It was, however, inevitable that in grappling with a task of such magnitude questions of judgment with respect to the precise limitation of the Commission's authority should arise. Moreover, it is not surprising that attempts to simplify or clarify procedural provisions in the statutes might unintentionally effect a real change in substance or meaning.

The first question before us is whether the changes made by the Commission in rewriting Paragraph 4590 of the 1935 *Code* effected changes in the meaning of the law.

The text of Paragraph 4590 of the 1935 *Code* is set out in the margin.[1] It is now embodied in Title 10, § 3112 of the 1953 *Code*. In codifying this statute the Commission split it into three subsections. The first paragraph of Paragraph 4590 became subsection (a) ; the second paragraph, subsection (b) ; and the third paragraph, subsection (c). Only minor changes in phraseology appear in subsections (a) and (c) ; but with respect to the proviso contained in the second paragraph of 4590 changes of more importance were made. Subsection (b) reads as follows:

---

[1]"Any non-resident owner, operator or driver of any motor vehicle, not registered under the laws of the State of Delaware providing for the registration of motor vehicles, who shall accept the privilege extended by law to nonresidents of this State to operate or drive such motor vehicles on the public streets, roads, turnpikes or highways of this State by operating or driving such motor vehicle or by having the same operated or driven on any public street, road, turnpike or highway of this State shall by such acceptance of said privilege be deemed thereby to have appointed and constituted the Secretary of State of the State of Delaware, his, her, its or their agent for the acceptance of legal process in any civil action against such non-resident owner, operator or driver arising or growing out of any accident or collision occurring within this State in which such motor vehicle, operated as aforesaid, is involved; and said acceptance shall be a signification of the agreement of such non-resident that any such process when so served, as aforesaid, shall be of the same legal force and validity as if served upon such non-resident personally within this State.

"Service of the legal process provided for in this section, with a fee of $2, shall be made upon the Secretary of State of this State in the same manner as is provided by law for service of writs of summons, and when so made shall be as effectual to all intents and purposes as if made personally upon such non-resident within this State; provided, that *not later than the day following the commencement of the action* a copy of the process and notice that service of the original of such process has *or will soon* be made upon the Secretary of State of this State are sent by registered mail by the plaintiff in the civil action to the non-resident defendant therein, and the defendant's return receipt and the plaintiff's affidavit of the defendant's non-residence and of the sending of the copy of the process with the notice are filed in the action *within* 10 *days of the receiving by the plaintiff of the defendant's return receipt.* The court in which the action is pending may order such continuances as may be necessary to afford the defendant therein reasonable opportunity to defend the action." (Emphasis supplied.)

The italicized language is new. It changes the time when notice must be mailed to the non-resident defendant, and the time when plaintiff's affidavit must be filed. It also changes the content of the notice by putting it in the alternative, and by

---

"Service of the legal process provided for in this Section with a fee of two dollars, shall be made upon the Secretary of State of the State of Delaware in the same manner as is now or may be thereafter provided by law for service or writs of summons, and when so made shall be as effectual to all intents and purposes as if made personally upon such non-resident within this State; provided, that a copy of the process with notice of such service, and that under the provisions of this Section it shall be as effectual to all intents and purposes as if it had been made upon such non-resident personally within this State, are forthwith sent by registered mail by the plaintiff in said civil action to said non-resident defendant therein, and the defendant's return receipt and the plaintiff's affidavit of the defendant's non-residence and of the sending of the copy of the process with the notice aforesaid are filed in the said action with the declaration. The Court in which said action is pending may order such continuances as may be necessary to afford the said defendant therein reasonable opportunity to defend the action.

"This section is an extension of and not a limitation upon the right now existing of service of legal process, by foreign attachment and otherwise, upon non-residents or their property in the State of Delaware."

omitting the requirement of a statement of the legal effect of service on the Secretary of State.

The parties are in disagreement whether these changes are changes in substantive law or are procedural merely. Of course they are in form procedural, but it is also clear that they embody important changes in meaning, as a comparison of the prior statute and the codification immediately discloses.

Under the original statute, the steps to be taken to subject non-resident motor vehicle operators to the jurisdiction of this state were as follows:

1. Filing of a *praecipe* commencing the suit.

2. Issuance of a writ of summons.

3. Service of the writ upon the Secretary of State.

4. Return of the writ by the Sheriff showing service.

5. Mailing by registered mail to the defendant "forthwith"—

(a) a copy of the process "with notice of such service"; and

(b) a notification that under the provisions of the statute the service "shall be as effectual to all intents and purposes as if it had been made upon such non-resident personally within this State."

6. The filing in the action "with the declaration" of the defendant's return receipt and the plaintiff's affidavit of defendant's non-residence and of the sending of the copy of the process and the notice.

The statute was originally enacted in 1927, Vol. 35, *Laws of Del.*, Ch. 225. Before the adoption of the 1953 *Code* the Superior Court had many times passed upon questions arising under it. The decisions of the Superior Court reflect the care taken by the courts to enforce the safeguards embodied in the statute for the protection of non-resident defendants, and they show that the statute, though procedural in form, has been regarded as one affecting substantive rights.

In *Felstead v. Eastern Shore Express, Inc.*, 5 *W. W. Harr.* (35 *Del.*) 171, 160 *A.* 910, plaintiff's failure to show compliance with the requirement that he inform defendant of the legal effect of the service was held to invalidate the service. This holding was reaffirmed in *Webb Packing Co. v. Harmon*, 8 *W. W. Harr.* (38 *Del.*) 476, 193 *A.* 596. The requirement, as embodying a legislative policy, was held to be mandatory.

In *Syracuse Trust Co. v. Keller*, 5 *W. W. Harr.* (35 *Del.*) 304, 165 *A.* 327, failure to deliver the registered letter containing the notice, although it appeared that the addressee had moved and his whereabouts were unknown, was held to invalidate the service. A similar holding, involving the refusal of the defendant to call for the registered letter, is found in *Paxson v. Crowson*, 8 *Terry* 114, 87 *A.* 2d 881.

In *Biddle v. Boyd*, 8 *W. W. Harr.* (38 *Del.*) 469, 193 *A.* 593, failure to state explicitly in the notice that service had been effected by the Secretary of State was held not to invalidate the service, but solely upon the ground that the copy of the writ of summons which had been sent to the defendant revealed that fact.

In *Webb Packing Co. v. Harmon*, 9 *W. W. Harr.* (39 *Del.*) 22, 196 *A.* 158, the meaning of the requirement that notice be sent "forthwith" was considered. It was held that the notice must be sent "forthwith" after the return day of the writ and that "forthwith" meant "with all reasonable dispatch consistent with the circumstances of the particular case.". This construction of "forthwith" was reaffirmed in *McLean Trucking Co. v. Stover*, 8 *Terry* 110, 87 *A.* 2d 879.

The following are the changes made in the codification:

(1) Whereas the original statute required notice to be sent "forthwith", the codification requires it to be sent within one day.

(2) Whereas the original statute required service to be made upon the Secretary of State and returned to the Prothon-

otary before notice was given to the defendant, it is now provided that such notice may be sent before service is effected, since it must be sent "not later than the day following the commencement of the action".

(3) Whereas the original statute required notice to the defendant of *completed service* on the Secretary of State, the notice now required is a statement that service "has [been] *or will soon be* made" upon him.

(4) Whereas the original statute required notice to the defendant of the legal consequences of service upon the Secretary of State, no notice of that kind is now required.

(5) Whereas the original statute required plaintiff's affidavit of non-residence, with defendant's return receipt, to be filed with the declaration, the affidavit is now to be filed within ten days of the receiving by the plaintiff of defendant's return receipt.[2]

Changes (1) and (5) are clearly within the scope of a revision. But changes (2), (3) and (4) effect important changes in meaning affecting the nature of the notice to be given to the non-resident defendant. As is said in *Webb Packing Co. v. Harmon*, 9 *W. W. Harr.* (39 *Del.*) 22, 196 *A.* 158, the sending of the notice is the substantive part of the process. The statute functions in a field of importance and delicacy—the subjection of non-residents to judgments *in personam* by means of (1) service upon an agent created by legal fiat (of course embodying a fiction) and (2) notice to the defendant. That such means must accord with due process, enjoined both by the federal and state constitutions, is elementary. A statute dealing with such a matter deals not only with procedure but with substantive rights. *Wood v. White*, 68 *App. D. C.* 341, 97 *F.* 2d 646. We consider this point more fully in our consideration of Question 2.

---

[2]This change conforms to the provisions of Rule 4(h) of the *Rules of the Superior Court* effective January 1, 1948.

■■ The new provision in the *Code* that notice to the defendant may be given before actual service is made might, as suggested by plaintiff, raise a question of due process. In the case of *Wuchter v. Pizzutti*, 276 *U. S.* 13, 48 *S. Ct.* 259, 261, 72 *L. Ed.* 446, 57 *A. L. R.* 1230, Chief Justice Taft said that a state may properly authorize service upon a non-resident motor vehicle operator to be made on one of its own officials "if it also requires that notice of that service shall be communicated to the person sued." No other statute of this sort that we have seen undertakes to predicate due process upon notice of intended service. It may well be that the essence of the notice is notice to the defendant of a pending action—not necessarily of completed service. *Cf. Grote v. Rogers*, 158 *Md.* 685, 149 *A.* 547, 551, and *Brammall v. LaRose*, 105 *Vt.* 345, 165 *A.* 916, 917. On this point we express no opinion. We merely say that the Commission has imported into the statute a provision for notice which seems to be without precedent and hence has effected a change in meaning.

The second change of importance is the deletion from the original statute of the requirement that notice to the defendant must include a notification of the legal effect of the service as set forth in the statute. It may be true, as suggested by Chief Justice Layton in the second *Webb Packing* case, *supra*, that due process of law does not require such notice to be given; but it is clear that the omission of a statutory requirement representing legislative policy designed for the protection of the defendant in the use of an extraordinary process is a change of the kind which the Code Commission was directed not to make.

A reading of the revisors' notes appended to § 3112 of title 10 shows that the changes were regarded by the Commission merely as an attempt to clarify the meaning of the statute and, as the Commission said, "to make more definite the precise nature of the notice." It seems probable that the implications of the changes made were not foreseen.

But in fact such changes were made. What is the legal result?

The *Code* was enacted as positive law. Have the courts the right to look beyond its language to the original statutes to determine its meaning?

Undoubtedly for some purposes they may do so. In the circumstances here presented there arises a very strong presumption that no change in substance or meaning was intended. As was said in *Nigro v. Flinn,* 8 *W. W. Harr.* (38 *Del.*) 368, 192 *A.* 685, 688, with respect to the 1915 *Code,* there exists "cogent evidence of the highest character, a legislative direction not to change or vary the meaning of any existing law," that no change in substance or meaning was intended.[3] There are many instances of ambiguity in code revisions, whether in respect of language, arrangement of sections, or otherwise, and many instances of additions of words intended to be clarifying, or of deletions of phrases thought to be redundant, in which the courts may and do look to the statute as it was before codification to find the underlying legislative intent. This principle is well settled and should be readily and liberally applied to any case of the kind just mentioned.

But this presumption, like many others, has its limits. When the language of a statute as revised and embodied in a code as positive law is plain and unambiguous, when its meaning is clear, and when it is unmistakably chosen for the purpose of effecting a change in the law, there is no room for construction, and the courts must enforce the statute as written. "It is, of course, true that if the existing law is, in fact, changed either by a Code, in its strict sense, or by a revision or compilation of statutes, the adoption of the Code, revision or compilation effectuates the change, no matter what the authority of the codifiers may have been." *Nigro v. Flinn, supra. Crawford, Statutory Construction,* § 324. The decided cases almost uniformly

---

[3]Chief Justice Layton's characterization of the legislative direction as "conclusive" must be read in the light of the preceding language of his opinion, which recognizes the general rule that unambiguous language must be given effect, and in the light of the facts of the case. The only reason advanced in the *Nigro* case for not applying the presumption was the "fortuitous circumstance" of the insertion of the section in a particular place in the code.

support this rule. See, for example, *Com. v. New York C. & H. R. R. Co.*, 206 *Mass.* 417, 92 *N. E.* 766; *Central of Georgia Ry. v. State*, 104 *Ga.* 831, 31 *S. E.* 531, 42 *L. R. A.* 518; *Ex parte Donnellan*, 49 *Wash.* 460, 95 *P.* 1085; *Saslow v. Previti*, 3 *A.* 2d 811, 17 *N. J. Misc.* 29; *Maddox v. First Nat'l Bank of Jefferson*, 191 *Ga.* 106, 11 *S. E.* 2d 662; *Fidelity & Columbia Trust Co. v. Meek*, 294 *Ky.* 122, 171 *S. W.* 2d 41; *Vela v. Shacklett, Tex. Civ. App.*, 1 *S. W.* 2d 670; *Champ v. Brown*, 197 *Minn.* 49, 266 *N. W.* 94; *State ex rel. Porter v. Ritchie*, 32 *Utah* 381, 91 *P.* 24.

In the instant case the most important change with which we are concerned is the change with respect to the time of mailing to the non-resident defendant the required notice respecting service upon the Secretary of State. Not only is the language of the statute clear but the intention to change the time of mailing the notice is unmistakable. This necessarily follows not only from the revisors' notes but from the language itself. The former statute required notice to be sent to the defendant "forthwith" after completion of service on the Secretary of State. The revision requires the notice to be sent "not later than the day following the commencement of the action". By no conceivable process of construction may the meaning of the latter phrase be held to be the equivalent of the former. There is no ambiguity to resolve. As is said in *Hamilton v. Rathbone*, 175 *U. S.* 414, 20 *S. Ct.* 155, 158, 44 *L. Ed.* 219, "prior acts may be resorted to, to solve, but not to create, an ambiguity." Nor is there anything inadvertent in the change of the phraseology. It is specifically designed for the purpose of change. It follows that no problem of construction can exist and that the presumption of no change, strong though it be, is overcome. For the court to substitute the phrase "following the completion of service" for the phrase "following the commencement of the action" would be for the court to assume the power of legislation.

These comments are applicable also to the changes made in the contents of the notice. In lieu of notice of previous service and of its legal effect, the defendant is informed that it has been

"or will soon be" made. This additional language is not inadvertent or superfluous. It is made necessary by the fact that one day might frequently be insufficient to issue the writ and have it served and returned. Thus, from the language of the *Code*, the intention to make the changes is clear.

It is said, however, that the rule of giving effect to unambiguous language has no application to the construction of a code prepared and adopted pursuant to legislative mandate' that the substance of the law shall not be changed, since in the latter case the legislative intent must be determined in the light of that mandate and not from the law itself. This argument lies at the heart of plaintiff's case. Any unauthorized change of substance appearing in the *Code* is, he says, a nullity. To accept this contention would be to reduce the *Code* to a mere compilation of prior statutes, having no force as law except as each section might conform to the substance of its predecessor. The principal legislative purpose would thus be defeated, since the intent to enact the *Code* as positive law is beyond question. In *Hamilton v. Rathbone, supra,* the Supreme Court had before it the 1874 revision of the statutes relating to the District of Columbia. A change in substance had been made with respect to the law concerning married women's property. The court said:

"The main object of the revision was to incorporate all the existing statutes in a single volume, that a person desiring to know the written law upon any subject might learn it by an examination of that volume, without the necessity of referring to prior statutes upon the subject. If the language of the revision be plain upon its face, the person examining it ought to be able to rely upon it. If it be but another volume added to the prior Statutes at Large, the main object of the revision is lost, and no one can be certain of the law without an examination of all previous statutes upon the same subject."

The court held that the language of the revision must be given effect.

The mischievous consequences of applying a different rule are apparent. In every case of important change in the revision an invitation would be extended to litigants to assert a substantial change in the meaning of the law not intended by the legislature. Nor would the task of the court be completed by a finding that such a change had been made. It must be conceded— at all events it is clear to us—that the General Assembly was informed that some changes in substance and meaning had been made. See the language of the 1953 report of the Commission above quoted. But for the most part that information respecting changes of substance was conveyed—as it had to be—in most general terms. Hence in every such case the courts would be required to determine the undeterminable—whether the members of the General Assembly had in fact understood and assented to the particular change in substance under consideration, that is, whether such change had been sufficiently called to their attention. The question of the validity of the statute would thus turn on the construction of the language of the Commission's report —a result lacking support both in reason and authority.

It has been said that the construction of statutes is "a practical science". See *Crawford, Statutory Construction*, § 176. The word "art" might be thought more apt; but it is certainly a practical matter. To push the elusive concept of "legislative intent" to the point of saying that the intent not to change the law overrides the intent to enact the *Code* is to destroy the *Code* as positive law. Such an unfortunate result we cannot sanction. The choice is plain; either a change clearly and unmistakably made in the *Code of* 1953 is the law, or it is not. Our conclusion is that since the *Code* was enacted as positive law the change must be given effect.

We are cited to numerous cases involving code revisions in which the courts have considered code revisions embodying changes in language apparently reflecting changes in meaning and in which the courts resorted to the prior statutes to ascertain whether any change was intended. See, for example, *Viola v. Cahir*, 70 *R. I.* 394, 40 *A.* 2d 733; *Welch v. Humphrey, Md.*,

90 *A.* 2d 686. It would serve no purpose to list and analyze all of these cases. They have been examined. They are cases of ambiguity in the revision itself, of inadvertent omission of words, of deletion of words thought to be superfluous, or the like. Language may be culled from some of them seeming to lend support to plaintiff's contention as to the limiting effect of a code commission's authority; but upon analysis the facts of these cases will be found to conform to one of the categories above mentioned, and to justify the conclusion that no change was intended. Here intention to change appears from the nature of the change itself. Many of these cases, like *Nigro v. Flinn, supra,* expressly affirm the fundamental rule that if intention to change appears unmistakably from the language of the revision the change must be given effect. Thus the Supreme Court of Rhode Island in *Viola v. Cahir, supra* [70 *R. I.* 394, 40 *A.* 2d 737], seems to go very far toward saying, at least by way of dictum, that a codifier's change in the law not called to the attention of the legislature is not an authentic act. Its conclusion, however, is stated as follows:

"There is, therefore, sound reason for the presumption which obtains generally that a general revision of the statutes of a state does not change the existing law, *unless an intention to make such change clearly appears.*" (Emphasis supplied.)

In the foregoing discussion we have assumed, as plaintiff would have us do, that the General Assembly in adopting the Code did not "intend" to change the law. What this really means is that the purpose of the General Assembly was to codify the law without changing it. But "legislative intent" includes more than purpose; it includes meaning as well. *Crawford, op. cit.,* § 160. The purpose of the legislature, i. e., the end sought to be achieved, was a codification of the law without change of substance, but the meaning of the enactment itself is something different, and is not necessarily controlled by the legislative purpose. The meaning of new provisions of the statute has been examined and found to be clear and unambiguous and the intention to make the change is unmistakable. Assum-

ing the change to have been erroneously made, that is, not to have been contemplated by the General Assembly, it is an error which must be corrected by the legislature and not by the courts.

It is our conclusion that the first question must be answered in the affirmative.

Question 1 A is as follows:

"What is the proper construction of Title 10, § 3112, of the *Delaware Code of* 1953, and the effect of its passage upon the procedure for service of process upon nonresidents as set forth in § 4590 of the *Revised Code of* 1935?"

The discussion with respect to Question 1 supplies the answer to Question 1 A. The provisions of Title 10, § 3112, of the *Code* present no problem of construction, and the effect of its passage was to change the method of effecting service upon nonresidents in the particulars above set forth.

Question 2 is as follows:

"If the answer to the first question is in the affirmative, is the provision for service in Title 10, Section 3112 *Delaware Code of* 1953 applicable to causes of action which arose prior to its effective date?"

The answer to this question depends upon whether or not changes made by the *Code* affect substantive rights. It is entirely clear from the *Code* itself that no substantive right was intended to be retroactively affected by the enactment of the *Code*. Title 1, § 104, provides:

"(a) The repeal of prior laws, provided in section 103 of this title, shall not affect any act done, or any cause of action accruing or accrued, or established, or any suit or proceeding had or commenced in any civil action, nor any plea, defense, bar, or matter subsisting before the time when such repeal shall take effect; but the proceedings in every such case shall conform with the provisions of this *Code*.

"(b) All the provisions of laws repealed by section 103 of this title shall be deemed to have remained in force from the time when they began to take effect, so far as they may apply to any department, agency, office, or trust, or any transaction, or event, or any limitation, or any right, or obligation, or the construction of any contract already affected by such laws, notwithstanding the repeal of such provisions."

Reading together the language of the two subsections we conclude that it was the legislative intent that all proceedings not affecting substantive rights should conform to the provisions of the *Code;* but if procedural provisions would have the effect of abrogating or in any way impairing a right or obligation theretofore existing the old provisions should continue in full force and effect in respect of any such right or obligation already existing.

These statutory provisions accord with well-settled principles of construction applied by the courts in the absence of express legislative direction. Statutory changes in practice and procedure are held to be applicable to causes of action existing prior to the change. *Bowing v. Delaware Rayon Co.*, 38 *Del.* 111, 188 *A.* 769. Statutes affecting substantive rights ordinarily operate prospectively only. *Distefano v. Lamborn*, 7 *Terry* 195, 81 *A.* 2d 675. But in many instances the relation between the right and the procedure is so close that a change in procedure may destroy or impair the right. *Crawford, Statutory Construction,* § 279.

In the instant case the procedure itself creates a substantial legal right. It creates the right to subject a non-resident to a judgment *in personam* in a jurisdiction where he has not been personally served. Such a statute involves the fundamental notion of due process of law and hence deals with substantive rights. The essence of the procedure is inseparable from the substance of the right.

As pointed out in *Ashley v. Brown*, 198 *N. C.* 369, 151 *S. E.* 725, 727, such a statute cannot be construed to apply to an accident happening before its passage, since such a construction

"would confer upon the plaintiff a legal right where none before existed". By like reasoning, a codification that abrogated entirely the statutory requirement that notice of the suit should be sent to the non-resident defendant could not be deemed a procedural change operating retrospectively, since it would destroy the right as well as the remedy. *Wuchter v. Pizzutti, supra.* All would agree, we think, that such a change would be one of substance, and that under the provisions of Title 1, § 104, it would not affect an accrued cause of action. This is not to say that strictly procedural amendments to a statute of this kind may not be held applicable to actions accrued prior to the adoption of the amendment. See *Duggan v. Ogden,* 278 *Mass.* 432, 180 *N. E.* 301, 82 *A. L. R.* 765; *Zavis v. Warren, D. C.,* 35 *F. Supp.* 689. But are the changes we are considering of that character?

In the instant case what has been done is to cast doubt upon the efficacy of the remedy, and hence to that extent impair the substantive right, by importing into the statute a method of notice to the defendant which fails to give him notice of actual service upon the statutory agent. As heretofore indicated, the necessary effect has been to raise a doubt as to the sufficiency of the new method of service to meet the requirements of due process.

 It may well be that upon full consideration of this point, in a case in which it could be properly raised and considered, the doubt could be dispelled. But we cannot pass upon it in this case. Until the matter is determined the doubt exists, and its existence is enough to resolve the question before us. That question is whether the act should be construed as applying retrospectively to causes of action already accrued. "Every reasonable doubt is resolved against a retroactive operation of a statute". 25 *R.C.L.* 787. The language of § 104 of Title 1, above quoted, is a clear mandate of the General Assembly that any right of a substantive nature, as distinguished from one purely procedural, is to be unaffected by the repeal of prior acts. At the time plaintiff's cause of action arose there was available to him the enforcement of a right by a means which had been

made, so far as reasonably possible, impervious to attack. We see no reason to give the statute retrospective operation and subject an already existing cause of action to the hazard of a decision upon a constitutional question.

We think the amendments embodied in the codification of the statute under consideration should be construed to have a prospective application only.

Question 2 is answered in the negative.

Question 3 is as follows:

"If the answer to both of the preceding questions is in the affirmative, is the title of the Act of the General Assembly by which the 1953 *Code* was adopted sufficient to meet the requirements of Article 2, Section 16 of the Delaware Constitution?"

Although it is not, strictly speaking, necessary to answer this question we undertake to do so in view of its importance.

Article II, Section 16, of the Delaware Constitution provides:

"No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."

The title of the act adopting the 1953 *Code* is as follows:

"An Act to Revise, Recodify, Arrange and Consolidate into a Code the Public and General Statutes of the State of Delaware." *Del. C.* vol. 2, p. 118.

The question of the compliance of the titles of legislative enactments with this provision has been many times considered by our courts. A review of the decisions would serve no useful purpose. We considered one phase of the question in *State v. Hobson*, 7 *Terry* 381, 83 *A.* 2d 846, 855. In that decision we cited with approval Judge Pearson's opinion in *State ex rel. James v. Schorr*, 5 *Terry* (44 *Del.*) 232, 58 *A.* 2d 421, in which, in speaking of the form of a title, he said:

"\* \* \* any form of words will do, so long as the body of the act is germane to the title."

We entertain no doubt of the legal sufficiency of the title. To paraphrase the language of *Monaghan v. Lewis, 5 Penn.* 218, 59 *A.* 948, 949, the title of the *Code* states in general terms the subject of the act, and the constitution requires no more.

Plaintiff's argument to the contrary runs as follows:

The General Assembly, although intending to enact a code as positive law, did not intend to change the substantive law. An act to revise, recodify and arrange the law and consolidate it into a code does not include any notice of any change in the law. Hence any law so changed, argues plaintiff, is unconstitutional because the title gave no notice of such change.

The fallacy in this reasoning is manifest. The constitutional provision does not require that every change in the substance of the law embodied in a new statute shall be enumerated in the title. It requires merely that the title be germane to the general subject dealt with in the act. "It need not go into details, or furnish an abstract, synopsis, or index of the contents of the act." *Monaghan v. Lewis, supra.*

This principle is especially applicable to the title of an act adopting a code. *Central of Georgia Ry. Co. v. State, supra; Crawford, Statutory Construction,* § 128.

Plaintiff's argument on this point really reduces to a reiteration of his contention under Question 1, that is, that the General Assembly did not intend any change in the substance of the law. This contention we have examined and rejected.

We are of opinion that the title of the act adopting the *Code* complies with the constitutional requirement.

The answer to the third question is in the affirmative.

Order answering the certified questions in accordance with the foregoing opinion.

WOLCOTT, Justice (dissenting as to Question No. 1).

I do not agree with the answer the majority of the Court has given to Question No. 1. That answer springs from the application of a judicially devised rule of statutory construction designed to ascertain "legislative intent", viz., that when language of a statute is plain and unambiguous on its face, courts may not alter the plain meaning by construction. I recognize the rule, but in my opinion it has no application to the case at bar. It presents no problem of statutory construction. The problem before us is which of two statutory provisions is the law of the state.

Numerous cases are cited by the majority of the court in support of the application of the rule of statutory construction referred to. However, so far as appears from the reported opinions, in none of them was the antecedent history of the codes then before the courts comparable to the background of the adoption of the *Delaware Code of 1953*.

The history of the adoption of the *Delaware Code of 1953* recited in the majority opinion demostrates clearly that the General Assembly intended by its adoption to make no change in the substance of the provisions of law governing suits against non-resident operators of motor vehicles, and that the Code Commissioners did not report that any such change had been effected. Indeed, it is apparent from the revision note following 10 *Del. C.*, § 3112(b) that the revision in language of that section was intended by the Commissioners to be merely an elimination of what was thought to be a minor ambiguity in the prior statute. However, the apparently inadvertent result of the revision of language has been substantial changes of such import as to completely change the policy of the law and to invite resourceful counsel to urge the unconstitutionality of the statutes as a deprivation of due process of law.

The actual intention of the General Assembly is factually clear in the case at bar. It was two-fold, first, to enact a code of laws, and, second, in enacting the code not to change the substance or policy of the existing law. The answer given by the

majority of the court to Question No. 1 gives effect to the first and denies the second. The result is to reject actual fact and to rely upon a judicial rule of statutory construction invented to ascertain in the absence of any factual showing an oftentimes fictitious "legislative intent".

It is said that no authority exists to give effect to the actual "legislative intent". But is this the fact? In *Atlantic Refining Co. v. Penn Seaboard Steel Corp.*, 16 *Del. Ch.* 1, 138 *A.* 724, the Chancellor referred to the joint resolution creating the 1915 Code Commission and to the report of the Commission to the General Assembly in order to determine the "legislative intent" in enacting the 1915 *Code.*

In *Nigro v. Flinn*, 8 *W. W. Harr.* 368, 192 *A.* 685, 688, the question was whether the inclusion of a Special Act of Limitation in the 1915 *Code* Chapter on General Limitations had made a change in the prior meaning of the Special Limitation Act. On the face of the *Code,* a change had been made, but the court held the prior law to be unchanged by the rearrangement of the sections. In the course of its opinion, the court referred to the rule of statutory construction applied by the majority in the case at bar, but stated that the rule is not controlling "where there are cogent reasons for believing that the letter does not fully and accurately disclose the intent." The court then discussed various rules of statutory construction which are oftentimes applied to ascertain "legislative intent", and finally concluded that in the case before it there was no necessity to rely upon them because "cogent evidence of the highest character, a legislative direction not to change or vary the meaning of any existing law, and the declaration of the codifiers that they endeavored to obey that direction, conclusively demonstrate the legislative purpose and intent in adopting the Revision of 1915." The same "cogent evidence" is before us in this case. In my opinion it "conclusively demonstrates the legislative purpose and intent" in adopting the Revision of 1953.

*Atlantic Refining Co. v. Penn Seaboard Steel Corp., supra,* and *Nigro v. Flinn, supra,* are not overruled by the majority of

the court, although both decisions stand for the proposition that the "legislative intent" in the enactment of a Code may be ascertained by reference to the authority conferred upon the Code Commission and its report to the General Assembly. The two decisions are stated by the majority of the court to be examples of cases of ambiguity in the revision, itself, of inadvertent omission of words, or deletion of words thought to be superfluous, or the like. However, if language of a revision is plain and unambiguous on its face, there could be no justification, under the theory of the majority of the court, for the supplying of unintentional or mistaken omissons. Furthermore, at least three of the decisions of other jurisdictions cited with approval by the majority flatly preclude such inquiry. See *Saslow v. Previti,* 17 *N. J. Misc.* 29, 3 *A.* 2d 811; *Vela v. Shacklett, Tex. Civ. App.,* 1 *S. W.* 2d 670; and *Hamilton v. Rathbone,* 175 *U. S.* 414, 20 *S. Ct.* 156, 44 *L. Ed.* 219.

Finally, it is said by the majority that to refuse to give effect to the unambiguous language of 10 *Del. C.,* § 3112(b) would be to reduce the 1953 *Code* to a mere compilation of prior statutes, and would be to defeat the principal legislative purpose of enacting the *Code* as positive law. This, however, is to substitute the judgment of the court for that of the General Assembly, since the intention of the General Assembly not to change existing law is as demonstrable as is its intention to enact a code of positive law. There is nothing which permits the conclusion that the General Assembly regarded its two-fold intention as separable. In the absence of such indication, I do not think the courts should guess at what the General Assembly would have done had it been cognizant of all the facts.

I think Question No. 1 should have been answered in the negative.