ELIZABETH L. CHAMP v. BERTHA E. BROWN AND AN-
OTHER, ADMINISTRATORS, SUBSTITUTED
FOR W. G. BROWN, DECEASED.[1]

March 27, 1936.

No. 30,653.

[1]Reported in 266 N. W. 94.

50

*Frank E. Dougherty, John W. Flynn,* and *Frundt & Morse,* for appellant.

*McCune & McCune,* for respondents.

JULIUS J. OLSON, JUSTICE.

The appeal is from a judgment entered pursuant to findings made by the district court of Martin county, which sustained an order of the probate court of that county approving the final account of W. G. Brown, as guardian of the estate of Elizabeth L. Champ, who had some years prior thereto been adjudged an incompetent person.

Since this appeal was perfected to this court Mr. Brown departed this life, and Bertha E. Brown and E. J. Merry were appointed administrators of his estate. They have been substituted as respondents here. But hereafter we shall consider Mrs. Champ as appellant and W. G. Brown as respondent, thereby simplifying the designation of the respective interests so as to harmonize with the title below.

To intelligently discuss the issues presented for review it is necessary that the facts be rather fully stated.

On September 1, 1916, appellant, then of the age of 48 years, was sought to be placed under guardianship by her oldest son, Robert W. Bird, "by reason of the imperfection of her mental faculties." In his petition to bring about this guardianship he alleged, "that she is and for several years has been infatuated with a certain tramp or vagrant sometimes known by the name of G. F. Hatch, sometimes by the name of Dr. Mate, and sometimes by the name of

Champ, and that she is about to marry said tramp or vagrant who is a thoroughly worthless, irresponsible, drunken and profligate man; that she takes the advice of said Hatch, Mate or Champ in property matters. That two or three years ago, she became so infatuated with said tramp or vagrant as to break up her own family relations, abandoning and neglecting her duties as a wife, and bringing action for divorce against her then husband, and that she has ever since been and is incompetent to manage her property, and unless a guardian is appointed for her, she is likely to and will, through her incompetency and infatuation, expose herself and her family to want and suffering, and is likely to and will spend and waste her property and estate." .

When this matter came on for hearing both the mother (appellant here) and the petitioning son were represented by experienced counsel. Perhaps to avoid a real family wrangle, in a situation obviously difficult and unpleasant, the parties entered into a stipulation dismissing the guardianship proceedings upon condition that appellant and her then newly acquired husband should join in executing a trust deed whereby title to her property, both real and personal, was to be vested in three trustees, one of whom was respondent Brown, another Mr. Redding, one of her attorneys, and the third a Mr. Richardson. In conformity with the stipulation, a deed was executed by the parties and the proceedings for the appointment of a guardian dismissed. The deed recited that whereas proceedings—

"had been instituted upon petition in the Probate Court of Martin County, Minnesota, looking to the appointment of a guardian for the above named Elizabeth L. Bird Champ upon the allegation that, because of loss and imperfection of her mental faculties, she is incapable of handling her property; and whereas the above named Zachariah Taylor Champ is a stranger supposed and feared to be incompetent to advise her in the management of said property.

"Now Therefore, In order to render a guardianship unnecessary at this time, and in order to allay the fears of the heirs apparent, family and friends of said Elizabeth L. Bird Champ as to the dissi-

pation and wasting of her property, and in order to provide for the maintenance and support of herself and of her minor children, this deed is made, and it shall be the duty of the above named trustees, and their successors, until the youngest living child of said Elizabeth L. Bird Champ shall have attained the age of twenty-one years, to receive the rents and profits of the lands hereinbefore described and apply the same to the use of said Elizabeth L. Bird Champ, and to provide the necessaries for her minor children, including schooling and education according to the circumstances of the parties, and to make provision for discharging the just debts and obligations of said beneficiary, either from said lands, rents, issues and profits, or from the personal property hereinbefore mentioned, or by selling or mortgaging the said real or personal property. The said rents, issues and profits, together with the personal property herein described and the increase and proceeds thereof, shall constitute a fund in the hands of such trustees to be used as hereinbefore and hereinafter directed.

"To receive and take charge of all moneys, stocks, bonds and valuable chattels of any kind to the said Elizabeth L. Bird Champ belonging, or which she may become possessed of during the continuance of this trust, and to invest and loan the same for her benefit.

"Permitting such personal property, or any part thereof, to be and remain in the actual possession and use of said Elizabeth L. Bird Champ as far in as, and as long as, she uses the same wisely, it being the intention of all parties hereto to wisely secure and apply the rents and profits of said lands and all of said personal property and the joint or separate income thereof, to the uses and purposes as hereinbefore expressed."

As will be noted, the trust agreement was to continue until the youngest living child of appellant should attain the age of 21 years. When that limitation was about to be reached, the same son, Robert, again filed a petition for his mother's guardianship. The court granted the same, apparently because there was no opposition thereto. The basis for the appointment was found by the court to be due to her "weak and imperfect mental faculties, that by reason of

her mental condition her property will be dissipated unless she is under the protection of a guardian." That order was made and dated June 26, 1925. Mr. Brown duly qualified and continued to act as guardian until August, 1934, when appellant was restored to capacity upon her own petition in that behalf. It appears that she made this application shortly after the death of her second husband, said Champ.

While the trustees were in charge of the property they invested the funds intrusted to them from time to time and apparently discharged all their duties without criticism from any source. When respondent took over the duties of guardian he apparently continued the same arrangement that had formerly been employed by the trustees.

The probate court allowed respondent's final account. In a memorandum attached to the order the court said:

"In making this order the court does not intend to ignore the objection filed in said matter, and the fact that the guardian neglected to avail himself of the protection offered under Section 8947 General Statutes of Minnesota, leaves his action and investments open to criticism, however, the court is fully advised as to the general financial conditions at the time the loans were made and had the guardian at that time petitioned this court for an order, under said statute, authorizing him to make the loans in question, this court would have issued such an order. Large fortunes have been lost and good business men have been reduced to poverty in handling their own investments during these trying times that have come onto us and which no man could foresee. In the opinion of this court the guardian should be commended rather than censured in the handling of these funds."

Upon appeal the district court found that appellant, Elizabeth L. Champ, "was at all times mentally competent to transact business, to handle her business affairs and care for her said property; that she received from respondent, as guardian, the income from said property and part of the principal, and handled and used the same as she saw fit; that respondent, as such guardian, consulted

with her about all investments made by him; that appellant knew what investments were being made and consented to and approved the making of such investments; that in all substantial acts the respondent, as such guardian, secured the consent and approval of appellant."

The court also found as a fact that the son Robert, who resides in the vicinity of Fairmont, that being the residence of the family, was consulted by respondent in respect of these investments and that he consented thereto and approved thereof. In addition, the court found:

"That in all investments made by respondent in real estate mortgages, the security was adequate at the time said mortgages were acquired by him; that respondent, in acquiring said mortgages and in all his said acts as such guardian, acted honestly and faithfully and exercised such sound discretion as men of ordinary prudence and intelligence use in their own affairs and at all times acted with a proper regard to the best pecuniary interest of the ward."

A further finding is to the effect that the persons who executed the criticized mortgages "are solvent" and that "it is not shown that any of the makers of the notes, evidencing said indebtedness, are unable to pay the same." Upon these findings the court concluded that the order of the probate court should be sustained and affirmed.

■ Appellant's first claim is that under the provisions of 2 Mason Minn. St. 1927, § 8947, the guardian becomes absolutely liable to his ward if he does not comply with the provisions of that section before making investments of his ward's funds. In other words, her claim is that the statutory requirements are mandatory. That section reads:

"Whenever a guardian has funds in his hands belonging to his ward he may petition the probate court, setting forth the estate of his ward, real and personal, and the amount of money which he desires to invest, with the facts upon which such petition is based, and any circumstances tending to show the expediency of such investment. The court, if satisfied that such investment is advisable

and for the best interest of the ward, may, without notice, order the guardian to make such investment."

Appellant then proceeds as follows:

"If, as we contend, the provisions of the statute are mandatory, then the following rule laid down in 28 C. J. 1139, 1140, is applicable: 'An investment made without an order of court is voidable, until it has been approved by the court, and cannot be charged against the ward on settlement of the guardian's account with him. * * * Where a statute requires the guardian to apply to and obtain the authority of the court before making an investment, the guardian is liable for a loss, if he makes the investment without proper authority, and good faith and care and prudence will not protect him.' If the statute is not mandatory but merely permissive, then it may be conceded that in the absence of an order of the court authorizing an investment, a guardian is not liable for loss resulting therefrom, if he acted in good faith and exercised due care and prudence."

It is then conceded that the section as it now reads appears to be directory only. But it is claimed that the historic background requires consideration of the language of the former statute. Our attention is directed to L. 1889, c. 46, §§ 161 to 164, inclusive. It will be noted that § 161 limits the character of investments which may be made by virtue thereof. That section in G. S. 1894 became § 4568. It was carried forward in R. L. 1905 as § 3751 and is now 2 Mason Minn. St. 1927, § 8834, subd. 3.

Sections 162, 163, and 164 became §§ 4569 to 4571 of G. S. 1894. There was no change until R. L. 1905. At that time the three last mentioned sections were condensed and rewritten into R. L. 1905, § 3845. It is now the section quoted above, 2 Mason Minn. St. 1927, § 8947.

"It is a generally accepted rule of statutory construction that a revision of existing statutes is presumed not to have changed their meaning, even if there be phraseological alterations, unless an intention to change clearly appears from the language of the revised statute when considered in connection with the subject matter of the

act and its legislative history." State ex rel. Decker v. Montague, 195 Minn. 278, 262 N. W. 684, 686-687.

Nor can there be any quarrel with appellant's claim, quoting from 2 Bouvier, Law Dictionary (Rawle's 3d Rev.) as follows:

"In interpreting statutes the word *may* should be construed as equivalent to *shall* or *must* in cases where the sense of the entire enactment requires it; * * * or where it is necessary in order to carry out the intention of the legislature; * * * or where it is necessary for the preservation or enforcement of the rights and interests of the public or third persons; * * *."

Many cases cited by appellant sustain this view.

The rule seems to be well settled that in construing the language of a revision reference may be had to prior statutes for the purpose of solving ambiguities or uncertainties. We may not resort to such acts, however, to create ambiguities where the language is plain. See State v. Stroschein, 99 Minn. 248, 109 N. W. 235; State v. Hovorka, 100 Minn. 249, 250-251, 110 N. W. 870, 8 L.R.A.(N.S.) 1272, 10 Ann. Cas. 398; Town of Iona v. County of Todd, 135 Minn. 183, 185, 186, 160 N. W. 669.

It is important that we bear in mind that in § 163 of the 1889 probate code the word "shall" was used. When the revisers rewrote that and the other mentioned sections into R. L. 1905, § 3845, there must have been a reason or purpose for changing the word "shall" to "may." We think the cases cited in 59 C. J. 1082, sustain this quotation from that authority:

"* * * an amendment substituting 'may' for 'shall' manifests a clear intent to make the act referred to optional and permissive instead of mandatory."

And as far back as Lovell v. Wheaton, 11 Minn. 57, 60 (92), this court said:

"The word *may,* in statutes, means *must,* or *shall,* only in cases where the public interests or the rights of third persons require it to be so construed."

In view of the long time that elapsed from the original adoption of the probate code in 1889 and the time of revision in 1905, there can be little doubt that there was a purpose and intent to change the statutory meaning to what it now is. It seems to us that there can be no doubt that the revisers knew the clear distinction in law between the meaning of the mandatory word "shall" as compared with the permissive word "may." Were we to construe the section as now contended for by appellant instead of solving ambiguities we would be creating such. A change was intended, and the chosen word so indicates.

Five mortgages are attacked by appellant as being unwise and improvident investments. Three of these are loans made by the guardian-respondent wherein he accepted second mortgages as security. Two thereof appear to be total losses. The guardian does not claim otherwise. As a matter of fact neither is included in his final account as an asset. These are the Nielsen loan of $500 and the Hill loan of $1,500. The third second-mortgage loan is that of Ward for $1,500. The security is gone, as the first mortgage was foreclosed and no redemption was made. But the evidence sustains the court's findings that the maker is solvent. He has a very substantial interest in the estate of his father, estimated to be worth from $150,000 to $200,000. The claim has been reduced to judgment. The record indicates that this loan will prove realizable in full. The remaining two loans are, one to Menke for $1,500 and another to Sanborn for $3,300. Both were secured by first mortgages upon improved real estate. The evidence as to these sustains the conclusion that the security was worth at least twice the amount of each loan when made. It cannot be seriously urged otherwise. Title to the Sanborn property has been acquired by deed, thereby avoiding foreclosure. There is evidence to sustain the trial court's findings respecting the propriety of both these loans.

We also think the evidence sustains the findings that when each of these five loans was made the value of the property mortgaged exceeded the loan by a ratio of two to one, i. e., each mortgage did not exceed 50 per cent of the actual value of the property secured thereby. But we do find difficulty in holding that second mortgages

may be considered provident investments for trust funds or the funds of guardians. As a matter of common knowledge this class of loans is generally regarded with suspicion by investors. One making such loan, to protect his security in event of default, must be prepared to finance also the prior mortgage. The result obtaining in two of the loans here involved proves the general rule. That type of securities is what led to the closing of many of our banks. No reasonably prudent man would place his money in that form of security if safety of the principal was his primary objective. We think it is clear that the statute (2 Mason Minn. St. 1927, § 8834) points the way and should be followed by guardians. As was said by this court in Masche v. Haas, 169 Minn. 294, 297, 211 N. W. 308, 309: "The statute suggests the policy." There the court had for consideration the mentioned section. That being the appropriate method with which to employ funds realized from sale of a ward's real estate, it would seem that in reason and by sound analogy the same rule should be applied to other cash funds available for investment by guardians.

By this we do not wish to be understood as going beyond our prior cases. What we said in Janke v. Espenson, 193 Minn. 201, 205, 258 N. W. 311, 313, as applicable to the duties of trustees generally in the handling of trust funds, is a reasonably safe guide also for guardians:

"The law requires of a trustee 'more than good faith and honest judgment.' It requires that the judgment of the trustee be 'enlightened and guided by the approved rules applicable to the investment of trust funds, not to his uninformed, personal judgment, exercised without reference to legal rules and principles. * * * He must always bear in mind that he is dealing with trust funds, which were not given him to be used in developing or furthering business enterprises, but to be guarded carefully and invested cautiously."

■ Was it competent for respondent to show at the trial that when these investments were made by the guardian appellant was in fact mentally competent and consented to and approved thereof?

Determination of this question is obviously conclusive against her if the answer be in the affirmative. It is contended in her behalf that the findings as to competency, consent and approval "cannot in any way affect the right of appellant to have her guardian's account surcharged with the money invested in the mortgages in question." This view is strongly urged and in support thereof is cited Thorpe v. Hanscom, 64 Minn. 201, 205, 66 N. W. 1, 2, and the following quotation therefrom emphasized:

"The law as to the contracts, including deeds and mortgages, of an insane person, is well settled. The deed of an insane person not under guardianship is not void, but only voidable, but while he is under actual and subsisting guardianship he is conclusively presumed incompetent to make a valid contract concerning his property, though in fact he is sane at the time of making the same. This rule is based upon convenience and necessity, for the protection of the guardian, and to enable him properly to discharge his duties as such. Without this rule it would be difficult, if not impossible, for the guardian to execute his trust, for in every action concerning the property of the ward he might be obliged to go before the jury upon the question of the ward's sanity, and one jury might find one way and another the other way."

The foundation for the rule there announced is as therein stated. It is based upon "convenience and necessity" and "for the protection of the guardian." If that rule were to be applied here it is clear that it would work the other way; instead of being for the protection of the guardian it would work against him and punish him for his well-intentioned acts after approval by a ward who was in fact mentally competent. Significant too is the fact that in the case cited and in the same paragraph of the opinion the court further said (64 Minn. 205-206):

"Now, when the reason for the rule does not exist, the rule does not apply. Hence, if there is in fact no actual and subsisting guardianship, but the same has been practically abandoned, and the person who had been under guardianship after such abandonment makes a deed at a time when he is in fact of sound mind, and

the contract is fair, the deed will be enforced, though the guardian has not been discharged by any judicial action. Elston v. Jasper, 45 Tex. 409.

"The evil and injustice of holding void the deed or contract of a person placed under guardianship during his insanity, made after the guardianship had been in fact abandoned, and when he was of sound mind, are emphasized by the facts of this case, where the defendant was in fact sane, and in the possession of his property, engaged in business as a merchant, also in buying and selling real estate, and foreclosing his mortgages, for some three years before the mortgage in question was made, without any objection or assertion of his rights by the guardian. To permit the defendant under such circumstances to repudiate all of his contracts and transactions during those years, simply because his guardian had not been formally discharged by the court, would be a travesty on the administration of justice."

There the court sustained a mortgage executed by the ward while under guardianship because the guardianship had been "practically abandoned" and the contract was in fact "fair."

In at least two subsequent cases decided by this court it has been held that an adjudication of incompetency in guardianship proceedings is only *prima facie* evidence thereof and is not conclusive. Thus in McAllister v. Rowland, 124 Minn. 27, 30, 31, 144 N. W. 412, 413, Ann. Cas. 1915B, 1006, the court said:

"It is equally well settled that a judgment or order in proceedings for the appointment of a guardian of an incompetent person and taking from such person the management of his property, is admissible in evidence in any litigation whatever, but not conclusive, to prove the person's mental condition at the time the order or judgment is made or at any time during which the judgment finds the person incompetent." (Citing cases.)

In Dahlsie v. Hallenberg, 143 Minn. 234, 173 N. W. 433, the McAllister case was cited with approval and followed. There the incompetent person was charged with wilful assault, and the issue

as to punitive damages submitted to a jury. There was a verdict for plaintiff, which was here affirmed upon defendant's appeal.

The facts in the instant case prove almost to a point of demonstration that when the first application for guardianship was made, some ten years prior to the time of Brown's appointment, the basic reason for the proceeding was that appellant was about to enter into a second marriage to a man believed to be an improvident person and that there was strong likelihood of dissipation on his part of appellant's property. In lieu of proceeding with the guardianship, the trust agreement, the facts concerning which have been fully stated, was entered into. When the youngest child had reached majority the guardianship proceedings were again brought and for the same purpose.

All of the income from the trust while it was operative and from the funds handled by the guardian since his appointment was turned over to appellant without qualification or limitation. There was neither hindrance nor supervision of the way in which she spent the money. While the guardianship lasted respondent paid appellant more than $9,000 in money. She employed attorneys to represent her in business transactions. Her testimony indicates very clearly that the trial court was fully justified in finding ·her mentally competent and capable of handling her own affairs.

To be noted also is the important fact that shortly after her second husband's death she petitioned to be restored to capacity. She was so restored. The supposed dangers incident to that marriage having been eliminated, restoration to "capacity" promptly followed. He and. he alone was the cause for the trusteeship and the subsequent guardianship. When he was removed from the picture no further "incompetency" on appellant's part remained.

It is a well recognized rule of law that the contract of a mentally incompetent person is not void. It is voidable only. Any act done or contract made by appellant, were it not for the guardianship, would presumptively be binding upon her until her incompetency was established by adequate proof. She should not be permitted to gain an unjust advantage over respondent where, as here abundantly appears, she was in fact fully competent.

Respondent's good faith in the sense of having acted honorably is affirmatively established. There is and can be no issue on that point. The probate judge heard the parties. The same individual before whom the original guardianship proceedings were instituted remained in office and decided all issues when presented. The trial judge on appeal heard the parties. Both are men of recognized and well earned reputation for their integrity and capacity. Were we to set aside their well conceived and fully sustained findings and conclusions we would be assuming a responsibility not properly ours.

The judgment must be, and it is, affirmed.

