## WILLIAM J. LONG AND OTHERS v. MAURICE CAMPION, GUARDIAN OF ESTATE OF THOMAS LONG.

84 N. W. (2d) 686.

July 5, 1957—No. 37,130.

*Donald F. Pratt*, for appellant.
*Gleason, Ward, Orff & Johnson,* for respondents.

KNUTSON, JUSTICE.

In the spring of 1949, Thomas Long, who was then about 77 years of age, inherited some property from a brother Edward. On May 5, 1949, he, together with plaintiffs Mae R. Thul and William J. Long and their father, William J. Long, Sr., went to the First National Bank of Minneapolis, and, out of the funds of Thomas, they purchased $15,000 of United States Government Savings Bonds, Series G, and registered them in his name, with $6,000 thereof p. o. d.[1] to plaintiff Mae R. Thul; $5,000 to plaintiff William J. Long; $2,000 to plaintiff Florence A. Nolan; and $2,000 to plaintiff Dorothy E. O'Neil. Mrs. Thul instructed the bank to notify her when the bonds were ready for delivery.

Thomas Long and William J. Long, Sr., were cousins. Plaintiffs are all children of William Long, Sr., so they are cousins once removed of Thomas Long. Plaintiff Florence A. Nolan lived in Chicago and plaintiff Dorothy E. O'Neil lived in Los Angeles, and neither of these individuals had seen Thomas Long for several years at the time the bonds were purchased.

On May 8, 1949, Thomas Long went to see Irving J. Clark, an attorney at law, who had represented him in the probating of the estate of his brother Edward and who had practiced his profession in Minneapolis for 41 years. He informed Clark that he was afraid of plaintiffs and stated that "they have got my bonds," and he indicated that he did not want them to have his bonds. As a result of this visit, Long and Clark went to the First National Bank and made arrangements to

---

[1]Payable on death.

have Clark, instead of Mrs. Thul, notified when the bonds were ready for delivery. On May 17, Clark and Thomas Long went to the bank and procured the bonds. A safety deposit box was rented in Long's name, and the bonds were deposited in it. The key to the box was left with Clark.

On the same day, May 17, Clark prepared and Long executed a last will and testament in which he provided that four-sevenths of the residue of his estate should go to the four plaintiffs in this case and three-sevenths thereof to Maurice Campion and two of his sisters, who also were distant relatives of Thomas Long.

During the latter part of June 1949, William Long, Sr., called Clark on the telephone and accused him of trying to get possession of Thomas Long's estate and money. Clark became angry as a result of this accusation and determined that it might be well to have a guardian appointed for Thomas Long. On June 28, 1949, Clark and Thomas Long went to the office of William E. MacGregor, another attorney in Minneapolis, who had practiced his profession for over 40 years. Maurice Campion, at the request of Thomas Long, was called on the telephone and came to MacGregor's office. That was the first time Campion had met either Clark or MacGregor. The matter of the p. o. d. bonds was discussed at length. Clark then suggested that a guardian be appointed for Thomas Long to protect him from the influence of plaintiffs. The matter of appointing a guardian was discussed with MacGregor. When MacGregor was told that Thomas Long did not want someone else named on the bonds payable upon his death, he told Long that he (Long) could petition for the appointment of a guardian; that the guardian could then do anything for him that he could do for himself; and that the guardian would be under bond and would have to account to the probate court for everything he did. He stated to Thomas Long that, if he wanted to petition the probate court for the appointment of a guardian, the court undoubtedly would appoint whomever he selected and that there would be no need for any publication or delay about it. MacGregor further told Long that, if the bonds were bought and registered in one person's name and p. o. d. to someone else, they would not become a part of the purchaser's estate when he died but, upon his death, would immediately belong to whoever the beneficiary was.

Long inquired whether he could make a will if a guardian were appointed, and he was advised that he could as long as he was competent, even though under guardianship. Thomas Long then stated that he did not need a guardian except for protection; that he did not want anyone to use any influence on him; and he mentioned particularly the William J. Long family, who, he said, had tried to influence him. He said that he wanted someone to stand between him and them or anyone who would try to influence him.

With respect to the bonds owned by Thomas Long, MacGregor informed Long that under Federal regulations he could not change the registration or cash the bonds within six months after they were issued. MacGregor suggested that, instead of appointing a guardian, he defer appointment until after the six months had expired and that he could then cash the bonds himself before a guardian was appointed. Long said that he wanted the guardian soon; that he did not want to wait for six months; and that he wanted protection from his relatives. He stated further that he wanted Maurice Campion as guardian because Campion had never tried to influence him.

On the same day, June 28, 1949, MacGregor, Clark, Long, and Campion went to the probate court in Minneapolis and there MacGregor, in the presence of Long, Clark, and Campion, told Judge Kehoe, the probate judge, that he was advised by Long that his relatives had prevailed upon him to buy government bonds in his name and had named these relatives as p. o. d. beneficiaries; that he did not understand that the bonds were bought that way; that the proceeds would not be a part of his estate in the event of his death; and that he wanted to change that situation. For that reason, Clark said that Long was considering the appointment of a guardian.

On that same day, June 28, Thomas Long did not make up his mind to go ahead with the guardianship. He went to Clark's home and remained there during the night. He returned to MacGregor's office on June 29 and then stated that he wished to go ahead with the guardianship. The petition was presented to the probate court, and Maurice Campion was appointed as guardian of his person and estate.

The petition for guardianship, which Long signed himself, states: "that said ward because of old age is incompetent to manage his person

and estate." The order of the probate court stated that Long was incompetent to have charge and management of his person and estate.

On November 8, 1949, Campion and Thomas Long came to see MacGregor in regard to cashing a government interest check. After discussing this matter, Long reminded MacGregor that the six months for cashing the bonds was up on November 1 and he wanted to know what had been done about it. He said that now that the six months was up it was time to do something with the bonds. MacGregor stated to Long that he (Long) appeared to be in good health and that there was no hurry about cashing the bonds but that he would get around to it when he could.

On December 20, 1949, MacGregor went to the Federal Reserve Bank to procure information concerning the cashing of the bonds, and on the same day he wrote Campion stating in effect that, if the bonds were delivered to the Federal Reserve Bank before January 3, 1950, properly endorsed by the guardian, they could be cashed and that all that would be necessary would be to submit a certified copy of his letters of guardianship. In that letter he advised Campion that, in order to transfer the bonds instead of cashing them, the consent of the p. o. d. beneficiaries would be necessary and that that might be difficult to procure since some of the beneficiaries lived at a distance.

On January 3, 1950, at the request of Thomas Long, the bonds were properly endorsed and, together with the guardian's certified copy of letters, were presented to the Federal Reserve Bank for the purpose of cashing them. No petition was made to the probate court seeking authority for the guardian to cash the bonds, and no order of the probate court specifically authorizing and directing the guardian to do so was procured.

A few days before February 14, 1950, government checks for the sum of $14,820, payable to Maurice Campion as guardian, were received at MacGregor's office. On February 14, 1950, Thomas Long and Campion came to MacGregor's office in connection with the disposition of the proceeds of the checks. MacGregor stated that the sale of the bonds had been completed and that the checks for the proceeds were here. Long, according to the testimony of MacGregor, said: " 'That's good,' and he smiled, and his face lighted up and his eyes

shown and he appeared to be a man who was very much pleased." They then discussed what should be done with the money, and MacGregor stated that the money could again be put into bonds, but Long stated that he did not want it that way as it took too long to cash the bonds and he wanted to put the money somewhere where he could get it promptly if he wanted it. They then discussed the matter of putting it in several savings banks, and, as a result of this discussion, a petition was prepared to the probate court in which it was stated:

"Petitioner has in his possession United States Government checks payable to himself in the total sum of Fourteen Thousand Eight Hundred Twenty Dollars ($14,820) received from the conversion of certain United States Government 'G' Bonds which were the property of the Ward and in the Ward's possession at the inception of said guardianship.

"Petitioner prays the order of this Court authorizing him to cash said checks and from the proceeds thereof * * *"

to deposit the sum of $880 in a checking account and the balance in designated savings and loan associations. The petition was presented to the probate court, and an order was made and filed on February 14, 1950, in which the authority petitioned for was granted. In the inventory filed by the guardian on August 31, 1949, the government bonds held and owned by the ward are listed in detail showing to whom they are p. o. d. This inventory was on file at the time the court's order was made, and the United States Government Bonds totaling $15,000 in cost value were substantially the only bonds held by the ward.

At the time the bonds were cashed, the guardian had in excess of $6,000 in cash belonging to the ward. It is conceded that the proceeds of the bonds were not then needed for care and support of the ward.

After procuring the court order of February 14, 1950, MacGregor, Campion, and Long went to the three savings and loan associations and deposited the money. Long was present and was interested in each detail in connection with the process of making these deposits. He was introduced to the people at the bank, and the regular routine of signing signature cards and identification was carried on in Long's presence and he observed every detail.

In August 1949, Campion assisted Long in procuring new living quarters in St. Paul. He had been living in Minneapolis prior to that time. Room and board were procured for him at the home of Mr. and Mrs. Earl R. Kinne, and he lived there until his death on December 19, 1950.

On August 17, 1949, Long went alone to Clark's office in Minneapolis. He informed Clark that he wished to draw a new will, excluding plaintiffs as beneficiaries. He stated that he wished to give the residue of his estate to the three Campion children in St. Paul. He was questioned by Clark at length as to whether he was certain he knew what he wanted to do, and he stated that he wished to omit the William Long family. In answer to Clark's questions, he stated: "Yes, it is. I refuse to be a door mat." He also said: "I don't want to be walked on." The will was properly witnessed and executed. It is substantially the same as the will drawn on May 17, 1949, with the exception that the plaintiffs are excluded as beneficiaries.

Mr. and Mrs. Earl R. Kinne, with whom Long lived from August 1949 until his death on December 19, 1950, stated that he ate his three meals regularly; that his health and appetite were good; and that he was quiet, good-natured, and very neat. They said that he went to Minneapolis alone from time to time; that he went regularly to church; that he would take walks by himself; that he would go to the barbershop three times a week; that he read newspapers and talked about current topics intelligently; and that he discussed the weather, the market for hogs, cattle, and other stock prices on this market and farming generally. He formerly had been engaged in farming. They stated that he read the Pioneer Press with understanding and that he knew what he was doing and understood at all times what he was doing. They testified that he had control over his mental processes; that he responded normally to questions; and that in their opinion he was mentally sound and was mentally competent to transact his own affairs up until the time of his death.

MacGregor and Clark both testified that in their opinion Long was mentally competent, and Campion testified in the same manner.

After Long's death, the will prepared on August 17, 1949, was filed for probate. Objections to its admission were filed by William

Long, Sr., and the validity of the will was litigated in the probate court, after which it was admitted to probate. An appeal was taken to the district court, and the decision of the probate court was affirmed. The time for appealing from that order has expired. Thereafter, this action was commenced by plaintiffs and it is in the nature of an action for conversion of the bonds by the guardian. The trial court made findings of fact holding in effect that the guardian had wrongfully converted the bonds when he cashed them and that plaintiffs were entitled to recover the value of the bonds from the guardian. This appeal is from a judgment entered pursuant to such findings.

In essence, the trial court's decision, and plaintiffs' position here, is that the guardian could not cash these bonds without first obtaining approval of the probate court.

As far as the right to cash the bonds is concerned, the rules and regulations of the United States are controlling. The regulations pertinent here, 31 Code Fed. Regs. §§ 315.38 and 315.46 (Cum. Supp. 1957), read:

§ 315.38. *"Payment to legal guardians.* * * * However, if a legal guardian presents for payment a bond so registered accompanied by proof of his appointment, payment will be made to such guardian."

§ 315.46. *"Payment to the registered owner.* The bond will be paid to the registered owner during his lifetime upon his properly executed request as though no beneficiary had been named in the registration.

\* \* \* \* \*

"The bond will also be reissued upon the duly certified request of the registered owner together with the duly certified consent of the designated beneficiary, to eliminate such beneficiary, or to substitute another person as beneficiary, or to name another person as coowner."

In Connell v. Bauer, 240 Minn. 280, 284, 61 N. W. (2d) 177, 180, 40 A. L. R. (2d) 776, 780, we held that "no state law can vary the terms of federal obligations nor derogate from their full enforceability."

Defendant contends that this case is decisive of the issues now before us and that, inasmuch as the p. o. d. provisions of the bond had been destroyed before the death of the registered owner, the beneficiaries have no further rights in such bonds. As far as the rights of the bond-

holder and those claiming under him are concerned, the Federal regulations are controlling insofar as any liability of the government or right to claim under the bonds is concerned.[2] But that is not the question now before us. The question here is: What are the rights of the beneficiary against a guardian of the registered owner who cashes the bonds so as to defeat the rights of the p. o. d. beneficiaries to receive the proceeds upon the death of the registered owner? That the ward could have done what the guardian did here, in the absence of a guardianship, no one can deny. But the United States is not interested in a dispute between a named beneficiary of a bond and a third party. Having paid the bond in accordance with its regulations, it has discharged its obligations and is no longer interested in the litigation here involved. In Connell v. Bauer, 240 Minn. 280, 61 N. W. (2d) 177, 40 A. L. R. (2d) 776, we held that such bonds could not be the subject of a gift inter vivos or causa mortis by manual delivery of the bonds without cashing them because the named beneficiary under the contract with the United States became absolutely entitled to the proceeds upon the death of the registered owner. However, in that case the p. o. d. provisions of the bond had not been destroyed prior to the death of the registered owner. Here, the bonds were cashed according to government regulations prior to the death of the registered owner; hence, the United States, having discharged its obligation, is no longer interested in the dispute.[3]

The question then is: What are the rights of the parties under our laws? Before proceeding to a determination of this question, we should dispose of the two findings of the trial court which well might be decisive of the case if they could be sustained.

Among other things, the court found:

"That at the time of converting and liquidating said bonds the guardian knew that he would by such liquidation stand to benefit as a beneficiary or a potential beneficiary under said will of August 17, 1949. While the testimony of defendant's witnesses reflected that defendant

---

[2]See, Note, 36 Va. L. Rev. 381; United States v. Dauphin Deposit Trust Co. (M. D. Pa.) 50 F. Supp. 73.

[3]See, Altman v. Altman, 234 Minn. 183, 47 N. W. (2d) 870; Petersen v. Swan, 239 Minn. 98, 57 N. W. (2d) 842; In re Estate of Lundvall, 242 Iowa 430, 46 N. W. (2d) 535.

did not know the contents of said will, nevertheless, under the circumstances thus existing, defendant had every reason to believe that he was favorably considered by his ward with whom he enjoyed a confidential and close relationship. That the guardian at said time intended to eliminate the plaintiffs as beneficiaries of said bonds without their consent or knowledge. That the guardian, although a fiduciary, made no attempt to secure judicial approval of the proposed conversion and liquidation of said bonds. That the guardian made no attempt to judiciously establish that the proposed conversion and liquidation of said bonds were for the best interests of the ward and the guardianship estate. That the guardian made no attempt to judicially establish that under equitable principles the beneficial interests of plaintiffs * * * should be terminated. That the guardian intentionally refrained from having a judicial determination of the ward's mental competency and of the ward's testimentary desires at a time when he could be examined personally by the Court which had adjudicated him an incompetent."

There is no evidence to sustain these findings. The evidence is conclusive that the guardian knew nothing of the change in the will of Thomas Long until after his death. It also shows conclusively that the ward and his attorney discussed the matter of cashing the bonds with the probate court before the appointment of a guardian. The guardian had heard that there was a will but did not know its contents. When the will of August 17, 1949, was executed, Long went to Clark's office alone. The finding is based only on a suspicion that, because the guardian turned out to be one of the beneficiaries under the will of Thomas Long, he cashed these bonds to benefit himself. The evidence shows conclusively that Long, both before and after the appointment of the guardian, wanted to get rid of the p. o. d. provisions of the bonds. As evidence thereof, on the same day that he went to the bank with Clark to change the arrangements originally made under which Mrs. Thul should be notified when the bonds were ready for delivery, he executed a will under which each of plaintiffs should share equally with the three Campions in the residue of his estate. It is hardly conceivable that at that time he wanted plaintiffs to have four-sevenths of the residue of his estate and all of the bonds, which constituted about three-fourths of his entire estate. Apparently plaintiffs were willing to accept a share

in the estate if they had been able to prevail in their objections to the admission of the last will and testament to probate. It was only when they failed in that attempt that they fell back on the p. o. d. provisions of the bonds in order to recover. There is nothing in the record, except an unsupported suspicion, which would justify the above finding.

■ The court next found that the ward in fact was incompetent to manage his estate. While the court does not specifically find that he was mentally incompetent, it indicates as much in the statement in the findings to this effect:

"* * * That the evidence does not show the ward was a 'competent incompetent' as suggested by defendant. That the ward was in fact incompetent to manage his person and estate."

It is clear that our statute contemplates the appointment of a guardian for a person under some circumstances where he is not necessarily mentally incompetent. M. S. A. 525.54 reads in part:

"The court may appoint one or two persons suitable and competent to discharge the trust as guardians of the person or estate or of both of any person who is a minor, or who because of old age, or imperfection or deterioration of mentality is incompetent to manage his person or estate, or of any person who because of excessive intoxication, gambling, idleness, or debauchery, so spends or wastes his estate or injures his person as to be likely to expose himself or his family to want or suffering, * * *."

The statute contemplates four distinct classes of persons subject to guardianship, namely, (1) minors; (2) those who, because of old age, are incompetent to manage their persons or estates; (3) those who, because of imperfection or deterioration of mentality, are incompetent to manage their estates; and (4) those who, because of excessive intoxication or the other vices mentioned in the statute, are apt to squander their estates.

■ A person for whom a guardian is appointed because of old age may or may not be mentally incompetent. The same is true of a minor.

■ Appointment of a guardian is only prima facie evidence of men-

tal incompetency in any case.[4]

■ In this case the petition was signed by Thomas Long to have a guardian appointed for himself because of old age. Not one word is said in the petition about any mental incompetency. Nor does the evidence sustain any such finding. In fact, all the evidence is to the contrary. It shows only that Long desired a guardian who could act as a buffer between himself and some of his relatives who were trying to influence him. While it may not be conclusive, the fact is that, after the appointment of the guardian, Long executed a new will, which has been admitted to probate over the objection of one of the plaintiffs after litigation in both the probate and district courts. While possession of testamentary capacity at the time of the execution of the will may not conclusively establish mental capacity during all the period of guardianship and particularly during the time when these bonds were cashed, it is significant that not one of the plaintiffs or anyone else took the stand to attempt to refute the testimony of all the witnesses who did appear that Long was at all times competent to manage his own affairs. We think that the court's finding as to the lack of mental capacity, if the finding can be so construed, is entirely lacking in evidentiary support. We start therefore with the assumption that, during the time when the bonds were cashed by the guardian, Long was mentally competent to manage his own affairs and, further, that it was his desire, both before and after appointment of the guardian, that the bonds be converted in order that the p. o. d. provisions thereof be destroyed as soon as that could be done under the Federal regulations. It is clear from the record that, if it had not been for the regulation prohibiting the cashing of the bonds for six months from the date of issue, they would have been cashed before the appointment of the guardian.

■ The duties of a guardian are defined by M. S. A. 1949, § 525.26, which, as far as here material, reads as follows:

"A guardian shall be subject to the control and direction of the court at all times and in all things. A general guardian of the person shall

---

[4]McAllister v. Rowland, 124 Minn. 27, 144 N. W. 412, Ann. Cas. 1915B, 1006; Dahlsie v. Hallenberg, 143 Minn. 234, 173 N. W. 433; Champ v. Brown, 197 Minn. 49, 266 N. W. 94.

have charge of the person of the ward. A general guardian of the estate shall

\* \* \* \* \*

"(3) Possess and manage the estate, collect all debts and claims in favor of the ward, or, with the approval of the court, compromise the same, institute suit on behalf of the ward and represent the ward in any court proceedings, and invest all funds, except such as may be currently needed for the debts and charges aforesaid and the management of the estate, in such securities as are authorized by section 50.14 and approved by the court, except as provided in section 48.84."

It is apparent that, under our statute, some duties of the guardian may be performed without approval of the court and others require such approval. He may, for instance, collect the debts of the ward without approval but must have such approval to compromise such debt. He must have such approval to invest the funds of the ward. While a prudent guardian would procure the approval of the court before selling personal property of considerable value,[5] he may sell the personal property of the ward without such approval.[6] Bonds such as we have here are contracts to repay money[7] and, as such, are debts due the ward.[8] The mere fact that the bonds, cashed before maturity, could be cashed only at a small loss, does not constitute the cashing of them a compromise. They were cashed according to the contract between the purchaser and the government for the full amount then due under the contract. Whether the guardian should be held liable for a loss occasioned by virtue of such cashing of the bonds is a matter which must be determined by the probate court in passing upon the final account of the guardian. Were it not for the p. o. d. provisions of the bond, it seems clear to us that the guardian would have had a right to cash such bonds without a court approval, both under the Federal regulations and under our statute, subject only to the requirement that he must exercise good faith *in the interests of the ward* and also subject to the

---

[5]Humphrey v. Buisson, 19 Minn. 182 (221).

[6]8 Dunnell, Dig. (3 ed.) § 4109.

[7]Decker v. Fowler, 199 Wash. 549, 92 P. (2d) 254, 131 A. L. R. 961; 27 Minn. L. Rev. 401, 402.

[8]See, State ex rel. Johnson v. Becht, 23 Minn. 1.

danger that, upon filing his final account, he might be held liable for loss occasioned by virtue of such cashing at less than had been paid for them in case the money was not needed for the support of the ward.

■ The question then arises: What rights do the beneficiaries of such bonds possess prior to the death of the registered owner? This presents a question which has been perplexing to the courts in many cases.[9]

It would seem that the interest of such beneficiary is that of a donee-beneficiary.[10] As such, he has an enforceable right which may be defeated by the cashing of the bonds before the conditions occur which permit enforcement by the beneficiary.[11] Obviously, the beneficiary has no right which may be enforced before the death of the owner. If the bonds are cashed by the registered owner before the death of the owner, the beneficiary loses whatever rights he had.

The right of a beneficiary in these bonds is closely analogous to the rights of a beneficiary under a policy of insurance, where the insured has no right to change the beneficiary but does have a right to surrender the policy for its cash value or the right to borrow on the policy. We have held that the rights of a beneficiary under such a policy are "vested" rights, subject to defeasance if the insured exercises his right to bor-

---

[9] See, for instance, In re Bartlett (N. D. N. Y.) 71 F. Supp. 514, 516 (bonds held not exempt from owner's creditors), wherein the court said that "the beneficiary has no present enforceable financial interest or ownership therein." In contrast, in In re Staheli's Will, 57 N. Y. S. (2d) 185, 187, affirmed, 271 App. Div. 788, 66 N. Y. S. (2d) 271 (bonds held not part of decedent's estate), the court said that "each beneficiary acquired a present interest at the time the bonds were purchased by the testator." See, also, Note, 36 Va. L. Rev. 381.

[10] 27 Minn. L. Rev. 401; Restatement, Contracts, § 133(1); 2 Williston, Contracts (Rev. ed.) §§ 356, 357; 36 Va. L. Rev. 381. For a definition of donee-beneficiary, see Northern Nat. Bank v. Northern Minnesota Nat. Bank, 244 Minn. 202, 70 N. W. (2d) 118.

[11] 27 Minn. L. Rev. 401. In Matter of Deyo, 180 Misc. 32, 41, 42 N. Y. S. (2d) 379, 388, the court said:

"The beneficiary's rights thus came into existence at the time the contract was made, though they were not to take effect in enjoyment until after the decedent's death. * * * It is unnecessary to denominate the beneficiary's interest. Whether it be called a defeasible vested interest * * *, a mere ex-

row on the policy.[12] The authorities are not all in harmony on this subject.[13]

Under government regulations, these bonds could not be reissued with a different beneficiary without the consent of the named beneficiaries. While this provision no doubt was made a part of the contract to further the desire of Congress of encouraging retention of the bonds to maturity, it does indicate that the beneficiary has some present right and not merely an expectancy.

■ The court apparently proceeded on the theory that the guardian could be held to have converted these bonds because it would be inequitable to permit him to cut out the beneficiaries, due largely to the fact that the guardian would benefit by doing so as a legatee under the will of his ward.

Possessing testamentary capacity, the ward had a right to leave his property to whomsoever he chose. In view of the result of the contest on his will, there can now be no doubt that he possessed testamentary capacity. The guardian acted at all times upon advice of counsel and with the approval and at the direction of the ward, who desired to cash the bonds both before and after appointment of the guardian. Further than that, he promptly reported to the probate court that the bonds had been sold. It is true that the report says nothing about cutting off the p. o. d. beneficiaries, but the inventory on file when the guardian filed his petition for authority to invest the proceeds of the bonds shows to whom the bonds are payable on the death of the ward. Even if it can be assumed that the probate court did not refer to the inventory, it can hardly be said that the guardian was trying to hide anything. The inventory was in the file and could easily have been examined. In view of all these facts, the case should be determined in the same manner as if the guardian was not named in the will of the ward as a legatee.

---

pectancy, or a contingent interest, is of no importance. * * * The fact that the beneficiary's right might be destroyed by decedent's redemption of the bonds prior to maturity does not affect the *existence* of her right; it merely characterizes it as conditional."

[12]Stahel v. Prudential Ins. Co. 189 Minn. 405, 249 N. W. 713.

[13]See, Vance, Insurance (3 ed.) § 108. With respect to the right of a guardian of an incompetent to change the beneficiary of a life insurance policy, see Annotation, 21 A. L. R. (2d) 1191.

When that is done, Champ v. Brown, 197 Minn. 49, 266 N. W. 94, is decisive of the issue here involved. In that case an attempt was made to surcharge the account of the guardian with certain investments alleged to have been improvidently made. There, as here, the ward was in fact mentally competent and approved the investments when made. We held that under those circumstances the guardian could not be held liable. Similarly here, where the guardian acts in good faith on the advice of counsel without concealing anything from the probate court and with the approval of his ward, who in fact was mentally competent, he cannot be held liable to the named beneficiaries in the United States Savings Bonds when such bonds are cashed so as to destroy their rights to receive the proceeds upon the death of the registered owner under the facts and circumstances of this case.

We need not determine what would be the result in a case involving fraud, undue influence, or other wrongful conduct on the part of the guardian. Here, there is no evidence of such. The guardian did exactly as the ward intended he should do. He acted in good faith on the advice of counsel. There is no evidence that he tried to hide anything. Under these circumstances, it would be most inequitable to hold that he should be held personally liable for conversion of these bonds.

It may be true that there are authorities to the contrary elsewhere. Many are based on statutes requiring approval of the court having jurisdiction over guardianships before personal property may be sold by a guardian which differ from ours.[14] Each case of this kind must stand on its own feet. No case has been cited in which the facts are identical with those now before us. Many of the cases cited involve bonds payable to coowners. The interest of a coowner is not necessarily identical with that of a p. o. d. beneficiary. It will serve no useful purpose to discuss those cases here. It is enough to say that we have examined them all and find no binding precedent in them.

Plaintiffs place much reliance on In re Guardianship of Overpeck, 211 Minn. 576, 2 N. W. (2d) 140, 138 A. L. R. 1375.[15] That case is of little help here. What we there held was that the probate court could

---

[14]See, for instance, In re Estate of Cornelison, 178 Kan. 607, 290 P. (2d) 1016.

[15]Discussed in 26 Minn. L. Rev. 767.

authorize the guardian of an incompetent ward to revoke a tentative trust by withdrawing from a bank deposits which created a tentative trust, payable on death to a designated beneficiary. The ward in that case in fact was insane. There was no showing that the ward desired to terminate the trust prior to appointment of a guardian. Neither was the action one for conversion. Instead, it was commenced as a proceeding to settle the account of the guardian. There is little similarity in that case and this, and we do not consider it decisive of the question now before us.

The decision of the trial court is reversed, and the case is remanded with instructions that judgment be entered in conformity with this opinion.

Reversed.