# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS DREW RUTLEDGE, | § | |
| | § | No. 248, 2025 |
| Plaintiff Below, | § | |
| Appellant, | § | |
| | § | |
| | § | Court Below: Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| CLEARWAY ENERGY GROUP | § | C.A. No. 2025-0499 |
| LLC, and CHRISTOPHER SOTOS, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees, | § | |
| | § | |
| and | § | |
| | § | |
| CLEARWAY ENERGY, INC., | § | |
| | § | |
| Nominal Defendant Below, | § | |
| Appellee. | § | |

Submitted: November 5, 2025
Decided: February 27, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW** and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon Certification of Questions of Law from the Court of Chancery. **CERTIFIED QUESTIONS ANSWERED.**

Gregory V. Varallo, Esquire (*argued*), Andrew E. Blumberg, Esquire, Daniel E. Meyer, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Esquire, Edward G. Timlin, Esquire, Christopher J. Orrico, Esquire, Thomas G. James, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Joel Fleming, Esquire, Lauren Godles Milgroom, Esquire, EQUITY LITIGATION GROUP LLP, Boston, Massachusetts; Aaron Morris, Esquire, Leo Kandinov, Esquire, *for Plaintiff Below, Appellant Thomas Drew Rutledge.*

Elena C. Norman, Esquire, Skyler A.C. Speed, Esquire, Alyssa T. Atkisson McKeever, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian M. Lutz, Esquire, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California; Colin B. Davis, Esquire, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; Jonathan C. Bond, Esquire (*argued*), Russell B. Balikian, Esquire, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., *for Nominal Defendant Clearway Energy, Inc.*

Srinivas M. Raju, Esquire, Matthew D. Perri, Esquire, Andrew L. Milam, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *for Defendants Below, Appellees Clearway Energy Group LLC and Christopher Sotos.*

Peter J. Walsh, Jr., Esquire, Michael A. Pittenger, Esquire, T. Brad Davey, Esquire, Callan R. Jackson, Esquire, Joshua S. Almond, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware. William Savitt, Esquire (*argued*), Ryan A. McLeod, Esquire, Anitha Reddy, Esquire, Alexander S. Mackler, Esquire, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *for Intervenor the State of Delaware ex rel. Governor Matthew S. Meyer.*

Ned Weinberger, Esquire, Mark D. Richardson, Esquire, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware, *for Amici Curiae, Corporate Law Academics in support of Appellant.*

John P. DiTomo, Esquire, Sara Carnahan, Esquire, Jacob M. Perrone, Esquire; MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *for Amici Curiae, Corporate Law Professors in support of Appellees and the State of Delaware.*

William M. Lafferty, Esquire, Lauren K. Neal, Esquire, Phillip Reytan, Esquire, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware; Nicole A. Saharasky, Esquire, Minh Nguyen-Dang, Esquire, MAYER BROWN LLP, Washington, D.C. *for Amicus Curiae, the Society for Corporate Governance, in support of Appellees.*

Anthony A. Rickey, Esquire, MARGRAVE LAW LLC, Wilmington, Delaware; Brian T. Frawley, Esquire, Matthew A. Schwartz, Esquire, Michael T. Lemanski, Esquire, William S.L. Weinberg, Esquire, SULLIVAN & CROMWELL LLP, New York, New York, *for Amicus Curiae, Chamber of Commerce of the United States of America, in support of Appellees and Intervenor the State of Delaware.*

2

**TRAYNOR**, Justice:

With the agreement of the parties, the Court of Chancery certified for our consideration two questions of law regarding the constitutionality of recent amendments to the Delaware General Corporation Law ("DGCL"). The challenged amendments purported to retroactively alter the standard of review that applies to certain transactions involving a controlling stockholder. We conclude that the statutory amendments do not violate the Delaware Constitution.

Senate Bill 21 ("SB 21") was passed by both houses of the 153rd General Assembly and signed by the Governor in March 2025. Among other things, SB 21 amended § 144 of the DGCL,[1] a statute that previously addressed contracts or transactions between corporations and interested directors or officers, to include "safe harbor" procedures for transactions between corporations and their controlling stockholders. SB 21 also added a definition of "controlling stockholder" to § 144 and set a standard for assessing director independence and disinterestedness.

Six weeks after the Governor signed SB 21 into law, Thomas Drew Rutledge, a stockholder of Clearway Energy, Inc., brought a derivative action against Clearway's former CEO, Christopher Sotos, and the majority stockholder of the company, Clearway Energy Group LLC, alleging that they breached their fiduciary duties. He claimed that Clearway overpaid Clearway Energy Group for an asset

---

[1] 8 *Del. C.* § 144.

3

related to a wind project in Idaho. This transaction—priced at $107 million—was purportedly approved by a committee consisting of directors that Clearway's majority-conflicted board deemed independent. The deal eventually closed for $117 million and was not approved by a majority-of-the-minority vote of Clearway's public stockholders. This unfair price, Rutledge alleged, was the result of Clearway Energy Group's and Sotos' (collectively, the "Clearway Defendants") breach of their fiduciary duties. He additionally sought a judgment declaring portions of SB 21 unconstitutional. Specifically, Rutledge's complaint alleged that (i) SB 21's safe harbor provisions violate Article IV, § 10 of the Delaware Constitution "by purporting to divest [the Court of Chancery] of equitable jurisdiction below the constitutional minimum established by Article IV, Section 10,"[2] and (ii) Section 3 of SB 21 violates Article I, § 9 of the Delaware Constitution "by purporting to eliminate causes of action that had accrued or vested before Senate Bill 21 was adopted."[3]

To address these constitutional issues and upon Rutledge's unopposed motion, the Court of Chancery certified the following questions to us under Article IV, § 11(8) of the Delaware Constitution and Delaware Supreme Court Rule 41:

> 1. Does Section 1 of Senate Bill 21, codified at 8 *Del. C.* § 144—
> eliminating the Court of Chancery's ability to award "equitable relief"
> or "damages" where the Safe Harbor Provisions are satisfied—violate

---

[2] App. to Answering Br. at B7.
[3] *Id.*

the Delaware Constitution of 1897 by purporting to divest the Court of Chancery of its equitable jurisdiction?

2. Does Section 3 of Senate Bill 21—applying the Safe Harbor Provisions to plenary breach of fiduciary claims arising from acts or transactions that occurred before the date that Senate Bill 21 was enacted—violate the Delaware Constitution of 1897 by purporting to eliminate causes of action that had already accrued or vested?

In its certification order, the Court of Chancery concluded that "there is an important and urgent reason for an immediate determination of the posed questions by the Supreme Court, the Court of Chancery has not decided the questions, and no facts material to the issue certified are in dispute."[4] "The court also found that the certified questions pose questions of law . . . of first instance in this State and also relate to the constitutionality, construction or application of a statute in this State which has not been, but should be, settled by the Supreme Court."[5] "Finally, the court concluded that certification was warranted in these unique circumstances because Delaware courts, corporations, litigants, and transaction planners alike will benefit from the Supreme Court resolving the questions resolved."[6]

Shortly after the court entered its order but before delivering it to this Court, the Court of Chancery granted Governor Matt Meyer's motion to intervene for purposes of participating in the appeal of the certified questions.

---

[4] D.I. 3. (cleaned up).
[5] *Id.* (cleaned up).
[6] *Id*. (cleaned up).

In our order accepting the certified questions, we "agree[d] with the Court of Chancery and [found] that there [were] important and urgent reasons for an immediate determination of the questions certified."[7]  For the reasons stated below, we answer both questions in the negative.  More specifically, we conclude first that, by establishing a framework for the review of certain transactions involving a controlling stockholder or a control group, the Safe Harbor Provisions set forth in Section 1 of SB 21  do not conflict with Article IV, § 10 of the Delaware Constitution.  That is so even though the provisions under certain circumstances affect the Court of Chancery's ability to award equitable relief or award damages in cases challenging controlling-stockholder transactions.  We conclude further that, by providing that the Safe Harbor Provisions apply to "all acts or transactions whether occurring before, on or after the enactment date," Section 3 of SB 21 does not violate Article I, § 9 of the Delaware Constitution.

I

We decide the constitutionality of the SB 21 amendments at issue as presented in the certified questions *de novo*.[8]  When reviewing legislative enactments, we follow our "strong judicial tradition" of presuming the constitutionality of those enactments.[9]  We have emphasized that "[l]egislative acts should not be disturbed

---

[7] *Id.*
[8] *Wells Fargo Bank, N.A. v. Estate of Malkin*, 278 A.3d 53, 59 (Del. 2022).
[9] *Opinion of the Justices*, 425 A.2d 604, 605 (Del. 1981).

except in clear cases . . . and should not be declared invalid unless [the legislative enactment's] invalidity is beyond doubt." [10] "One who challenges the constitutionality of a statute has the burden of overcoming the presumption of its validity."[11]

## II

Sections One and Three of SB 21 address, among other things, how directors and stockholders may approve corporate transactions in a way that limits the liability of controlling stockholders. To put into context the changes SB 21 effected, we first provide the jurisprudential background against which the General Assembly and the Governor approved the legislation. We hasten to acknowledge that what follows is not an exhaustive examination of the evolution of our law governing judicial review of controlling-stockholder transactions. We hope, however, that a broad outline of certain key turning points in this area will enable the reader—one not steeped in the arcana of Delaware corporate law—to gain a general understanding of the background against which SB 21 was adopted.

## A

Over time, our corporate law jurisprudence has developed standards of review that our courts will apply when determining whether corporate fiduciaries—

---

[10] *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974) (citing *Klein v. Nat'l Pressure Cooker Co.*, 64 A.2d 529 (Del. 1949)).
[11] *Id.* (citing *State v. Brown*, 195 A.2d 379 (Del. 1963)).

typically, but not always, corporate directors—have violated their fiduciary duty. On the more lenient end of the review spectrum is the business judgment rule, which entitles directors "to a *presumption* that they were faithful to their fiduciary duties."[12] On the other end of the spectrum lies the exacting entire-fairness standard—"the highest standard of review in corporate law."[13] To satisfy the entire-fairness standard, the defendant bears the burden of persuasion and must demonstrate that the transaction or act is entirely fair, as to both price and process, to the corporation and its stockholders. Entire-fairness review can be fact-intensive, so entire-fairness cases often survive a motion to dismiss,[14] which in turn exposes the defendant to further litigation expenses and increases the likelihood that the case will proceed to trial.

Our law has long recognized that when a controlling stockholder of a corporation engages in a transaction with the corporation, the conflicts of interest that inhere in the transaction call for heightened scrutiny lest the interests of the corporation and its minority stockholders be insufficiently heeded. On the one hand,

---

[12] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) (emphasis in original).

[13] *Maffei v. Palkon*, 339 A.3d 705, 729 (Del. 2025) (quoting *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014)).

[14] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1180–81 (Del. 2015). ("When [the entire-fairness] standard is invoked at the pleading stage, the plaintiffs will be able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty.").

all stockholders have the right to vote their shares in their own best interests. On the other hand, controlling stockholders owe a fiduciary duty of loyalty to the corporation and its minority stockholders when they exercise their control over corporate actions and decisions. On top of that, when a controlling stockholder stands on both sides of a transaction "both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders—are considered compromised by the controller's influence."[15] In recognition of these tensions and to protect against exploitation of the minority, when a controlling stockholder engages in self-dealing—that is, when it employs its control to cause the corporation to enter into a transaction in which the controller receives something "to the exclusion of, and detriment to, minority stockholders"[16]—upon judicial review, the controller must demonstrate the intrinsic fairness of the transaction.

This principle was forcefully articulated in *Weinberger v. UOP, Inc.*,[17] which involved a challenge to a merger in which a corporation that was a majority stockholder of its subsidiary acquired the remaining shares, cashing out the subsidiary's minority stockholders. In addressing "the absence of any attempt to

---

[15] *Maffei*, 339 A.3d at 730 (quoting *Larkin v. Shah*, 2016 WL 4485447, at *9 (Del. Ch. Aug. 25, 2016)).

[16] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[17] 457 A.2d 701 (Del. 1983).

structure [the] transaction on an arm's length basis" and the effects of the conflicts the controlling stockholder's designees to the subsidiary's board faced, this Court emphasized:

> There is no "safe harbor" for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain. The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.[18]

Bedeviled by this predicament, corporate-transaction planners devised "cleansing" mechanisms that would assuage the concerns—the absence of arm's length negotiations and the controller's coercive influence—animating the entire-fairness standard. One such device is the approval of the transaction by an informed vote of a majority of the minority stockholders. In *Rosenblatt v. Getty Oil Co.*,[19] this Court held that, although a merger effected by a majority shareholder was subject to entire-fairness review even when approved by an informed vote of the majority of the minority shareholders, such a vote "shifts the burden of proving the unfairness of the merger entirely to the plaintiffs."[20]

A decade later, in *Kahn v. Lynch Communication Systems, Inc.*,[21] this Court affirmed the principles announced in *Weinberger* and *Rosenblatt* when it considered

---

[18] *Id.* at 710 (citations omitted).
[19] 493 A.2d 929 (Del. 1985).
[20] *Id.* at 937 (citation omitted).
[21] 638 A.2d 1110 (Del. 1994).

10

whether the approval of a cash-out merger effected by a controlling stockholder by an independent committee of disinterested directors would alter the review standard. Justice Holland, writing on behalf of the Court, emphasized that such approval did not prompt a lower standard of review but noted that it was another way for defendants to shift the burden of persuasion onto the plaintiff. Thus, under *Khan v. Lynch* and *Rosenblatt*, the defendants could shift the burden of persuasion to the plaintiff by showing that the challenged transaction was approved by a well-functioning independent committee *or* that it was approved by any informed majority-of-the minority vote.

The burden-shifting approach was small consolation for defendants whose claims against them were subject to entire-fairness review. As mentioned earlier, those claims generally could not be dismissed at the pleading stage, and costly litigation would follow. That changed with this Court's 2014 decision in *Kahn v. M & F Worldwide Corp.*,[22] now commonly referred to as *MFW*, which clarified that the employment of both burden-shifting devices in the same transaction would change the standard of review:

> To summarize our holding, in controller buyouts, the business judgment standard of review will be applied *if and only if:* (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and

---

[22] 88 A.3d 635 (Del. 2014).

to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[23]

As we later observed, "*MFW* and later cases cleared the way for defendants in controlling stockholder transactions to gain pleading-stage dismissal of complaints."[24] But *Weinberger*, *Rosenblatt*, *Kahn v. Lynch*, and *MFW* were all decided in the freeze-out merger context. Our 2024 decision in *Match* addressed whether *MFW*'s framework should be applied to transactions outside that context. We decided that it did: when a controlling stockholder stands on both sides of a transaction and receives a non-ratable benefit, "[t]he presumptive standard of review is entire fairness, unless the defendants can satisfy *all of MFW*'s requirements to change the standard of review to business judgment."[25]

Accordingly, under our holding in *Match*, "[t]he controlling stockholder can shift the burden of proof to the plaintiff by properly employing a special committee or an unaffiliated stockholder vote. But the use of just one of these procedural devices does not change the standard of review. If the controlling stockholder wants to secure the benefits of business judgment review, it must follow all *MFW*'s requirements."[26]

---

[23] *Id*. at 645 (footnote omitted).
[24] *In re Match Group, Inc. Deriv. Litig.*, 315 A.3d 446, 463 (Del. 2024).
[25] *Id.* at 470–71 (emphasis in original).
[26] *Id*. at 451.

12

B

Separate from, but related to, the cases addressing standards of review discussed above, Court of Chancery jurisprudence and this Court's case law concerning what constitutes "control" of a corporation was developing. Our level-setting exercise here need not chart the course of the development of the concept of control in the controlling stockholder context. It suffices for present purposes to summarize certain principles that were extant as the General Assembly considered SB 21. And for that we turn to our recent decision in *In re Oracle Corporation Deriv. Litig.*[27]

> [A] stockholder who owns or controls over 50% of a Delaware corporation's stock is presumed to exercise "hard" control and assumes fiduciary duties in certain circumstances. This is because a majority stockholder controls the levers of power within the corporation . . . .
>
> Conversely, a stockholder who owns or controls less than 50% of a corporation's voting power is not presumed to be a controlling stockholder with fiduciary duties. Even so, a minority stockholder can be a controlling stockholder by exercising actual control over the corporation's business and affairs or by exercising actual control over a specific transaction.
>
> The test for actual control by a minority stockholder "is not an easy one to satisfy." The minority stockholder must have "a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock." To prove actual control over a specific transaction, a plaintiff must prove that the minority stockholder

---

[27] 339 A.3d 1 (Del. 2025).

13

"exercised actual control over the board of directors during the course of a particular transaction."[28]

With this background in mind, we turn to the relevant provisions of SB 21 and the arguments for and against their constitutionality.

C

SB 21 amends §§ 144 and 220 of the Delaware General Corporation Law. The amendments to § 220, which governs stockholder inspections of corporate books and records, are not implicated by the questions the Court of Chancery certified to us. We therefore confine our discussion to the amendments to § 144.

The most significant amendments to § 144 are the provisions governing controlling-stockholder transactions. Under § 144(e)(3), a controlling-stockholder transaction is defined as:

> [A]n act or transaction between the corporation or 1 or more of its subsidiaries, on the 1 hand, and a controlling stockholder or a control group, on the other hand, or an act or transaction from which a controlling stockholder or a control group receives a financial or other benefit not shared with the corporation's stockholders generally.[29]

SB 21 also redirects the previously mentioned judicial development of the concept of "control" by defining the term "controlling stockholder." Now, under § 144(e)(2), "controlling stockholder" means any person that, together with such person's affiliates and associates:

---

[28] *Id.* at 19–20 (citations omitted).
[29] 8 *Del. C.* § 144(e)(3) (defining "Controlling stockholder transaction").

14

a.     Owns or controls a majority in voting power of the outstanding stock of the corporation entitled to vote generally in the election of directors or in the election of directors who have a majority in voting power of the votes of all directors on the board of directors.

b.     Has the right, by contract or otherwise, to cause the election of nominees who are selected at the discretion of such person and who constitute either a majority of the members of the board of directors or directors entitled to cast a majority in voting power of the votes of all directors on the board of directors; or

c.     Has the power functionally equivalent to that of a stockholder that owns or controls a majority in voting power of outstanding stock of the corporation entitled to vote generally in the election of directors by virtue of ownership or control of at least 1/3 in voting power of outstanding stock or the corporation entitled to vote generally in the election of directors or in the election of directors who have a majority in voting power of the votes of all directors on the board of directors and power to exercise managerial authority over the business and affairs of the corporation.

Section 144(e)(1) defines "control group" as "2 or more persons that are not controlling stockholders that, by virtue of an agreement, arrangement, or understanding between or among such persons, constitute a controlling stockholder."

The Safe Harbor Provisions referred to in the first certified question reside principally in § 144(b) and (c). Under subsection (b), "a controlling stockholder transaction (other than a going private transaction) may not be the subject of equitable relief, or give rise to an award of damages, against a director or officer of the corporation or any controlling stockholder or member of a control group, by reason of a claim based on a breach of fiduciary duty" if one of two of the cleansing

15

mechanisms discussed earlier are followed. Subsection (b) codifies those mechanisms, which are employed when:

(1) The material facts as to such controlling stockholder transaction (including the controlling stockholder's or control group's interest therein) are disclosed or are known to all members of a committee of the board of directors to which the board of directors has expressly delegated the authority to negotiate (or oversee the negotiation of) and to reject such controlling stockholder transaction, and such controlling stockholder transaction is approved (or recommended for approval) in good faith and without gross negligence by a majority of the disinterested directors then serving on the committee; provided that the committee consists of 2 or more directors, each of whom the board of directors has determined to be a disinterested director with respect to the controlling stockholder transaction; or

(2) Such controlling stockholder transaction is conditioned, by its terms, as in effect at the time it is submitted to stockholders for their approval or ratification, on the approval of or ratification by disinterested stockholders, and such controlling stockholder transaction is approved or ratified by an informed, uncoerced, affirmative vote of a majority of the votes cast by the disinterested stockholders; or

if neither of the mechanisms is employed, then liability can be avoided only if the transaction is deemed to be "fair as to the corporation and the corporation's stockholders."[30]

By enacting subsection (b) of § 144, the General Assembly displaced our ruling in *Match*. Subsection (c) retained the *MFW* framework—the requirement that both cleansing mechanisms be observed—but only for going-private transactions.[31]

---

[30] 8 *Del. C.* § 144(b)(3).

[31] "Going private transaction" is defined in § 144(e)(6) as either a Rule 13 e-3 transaction under the Securities and Exchange Act of 1934 or "any controlling stockholder transaction, including a merger, recapitalization, share purchase, consolidation, amendment to the certificate of

In essence, SB 21, and specifically subsections (b) and (c) of new § 144, codified the result that the defendants advocated, and we rejected, in *Match*.[32]

Other provisions of SB 21 that might also be fairly characterized as "safe harbors" include (i) a definition of "disinterested director" as "a director who is not a party to the act or transaction and does not have a material interest in the act or transaction or a material relationship with a person that has a material interest in the act or transaction," and (ii) a rebuttable presumption that directors of public companies are disinterested if the board has determined that the director is independent under applicable stock exchange rules.

Relevant to the second certified question, Section 3 of SB 21 provides that amended § 144 "appl[ies] to all acts and transactions, whether occurring before, on, or after the enactment of this Act" except for "any action or proceeding commenced in a court of competent jurisdiction that is completed or pending . . . on or before February 17, 2025."[33]

---

incorporation, tender or exchange offer, conversion, transfer, domestication or continuance, pursuant to which all or substantially all of the shares of the corporation's capital stock held by the disinterested stockholders (but not those of the controlling stockholder or control group) are cancelled, converted, purchased, or otherwise acquired or cease to be outstanding."

[32] Subsection (b)(1) also departs from *Match*'s holding that, for a special committee to be deemed independent all directors serving on the committee must be disinterested. Under subsection (b)(1), if the committee path is followed, although the board is charged with determining that all members of the committee are disinterested, the committee's decision will be respected, even if the court were to disagree with that determination, if approved by a majority of the directors the court deems independent.

[33] S.B. 21, 153d Gen. Assemb. § 3 (2025).

D

Rutledge argues that SB 21's safe harbors are unconstitutional because they impermissibly deprive the Court of Chancery of its equity jurisdiction. The safe harbors, Rutledge believes, violate Article IV, § 10 of the Delaware Constitution of 1897, which imbues the Court of Chancery with the "jurisdiction and powers vested by the laws of this State[.]"[34] In his view, the safe harbors, which expressly require—under certain conditions—that an action may not be the "subject of equitable relief, or give rise to an award of damages," cause an unconstitutional reduction of the Court of Chancery's equity jurisdiction.[35]

The Clearway Defendants and the Governor defend the amendments. As to the safe harbors, the Clearway Defendants emphasize that SB 21 does not reduce the Court of Chancery's jurisdiction, that is, its power to hear and determine a case, but instead provides a statutory "review framework" for analyzing fiduciary-duty claims. They also argue that the enactment of the amendments aligns with the history of the General Assembly exercising its powers to legislate on matters of equity.

The Governor largely concurs with the Clearway Defendants' position but underscores that SB 21 does not reduce the Court of Chancery's equity jurisdiction

---

[34] Opening Br. at 16 (quoting Del. Const. art. IV, § 10).
[35] *Id.* at 26–28 (quoting 8 *Del. C.* § 144(b)(1) (as amended by SB 21)).

because the amendments do not disturb its power to adjudicate. The Governor stresses that the Court of Chancery retains jurisdiction over breach of fiduciary duty claims, and importantly, has the power to determine whether the requirements for the safe harbors to apply have been satisfied.

E

It is not disputed that stockholder complaints alleging that a controlling stockholder has breached its fiduciary duty in a corporate transaction to the detriment of minority stockholders fall within the Court of Chancery's equity jurisdiction. It is equally beyond dispute that Article II of the Constitution of 1897 vests "[t]he legislative power of this State . . . in [the] General Assembly . . . ."[36] This legislative power includes the power to create and amend the general corporate law with the concurrence of two-thirds of all the members elected to each House of the General Assembly.[37] That voting threshold was met, with SB 21 passing the Senate by a vote of 20-0 (one absent) and the House of Representatives by a vote of 32 in favor, seven against (two absent). The first certified question pits the authority of the Court of Chancery to exercise its equity jurisdiction against the General Assembly's power to legislate.

---

[36] Del. Const. art. II, § 1.

[37] Del. Const. art. IX, § 1 ("No general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all members elected to each House of the General Assembly.").

19

Rutledge derives his argument that SB 21 represents an impermissible exercise of the General Assembly's legislative power from two unassailable premises. The first premise is that Article IV, § 10 confers equity jurisdiction on the Court of Chancery. This is well-settled. The second premise is that this grant of jurisdiction empowers the Court of Chancery to fashion equitable remedies for breaches of fiduciary duties. Like the first premise, this one is not disputed. It is the conclusion that Rutledge draws from these premises that must be tested. Rutledge concludes that, because SB 21 alters the contours of corporate directors' and officers' fiduciary duties and the standards by which the Court of Chancery must review breach of fiduciary duty claims, it encroaches impermissibly on that court's equity jurisdiction. That conclusion, in our view, collapses under scrutiny as our review of the cases on which Rutledge relies and the history of the General Assembly's modification of our general corporate law demonstrates.

We begin, however, with a brief historical sketch of the genesis of the Court of Chancery's equity jurisdiction. As this Court observed in *DuPont v. DuPont*,[38] "no one denies that the general equity jurisdiction of the Court of Chancery . . . is defined as all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies, subject to the proviso . . . that the Chancellor shall not hear and determine any cause where a sufficient remedy

---

[38] 85 A.2d 724 (Del. 1951).

20

exists at law."[39]  The Court of Chancery's jurisdiction is deeply rooted in our constitutional history.  Delaware's first Constitution of 1776 carried forward the equitable jurisdiction that had been established during the colonial era in a statute known as the Gordon Act.[40]  Until 1792, general equity jurisdiction resided in the Court of Common Pleas.  The Constitution of 1792 created the Court of Chancery as a separate court of equity and vested "[t]he equity jurisdiction heretofore exercised by the Judges of the Common Pleas . . . in a Chancellor, who shall hold Courts of Chancery in the several counties of this state."[41]  The Constitutions of 1831 and 1897—our current constitution—maintained the Court of Chancery as our court of equity.

F

The principal precedents Rutledge relies upon are *DuPont v. DuPont*[42] and *In re Arzuaga-Guevara*.[43]  Neither, we conclude, controls our answer to the first certified question.  In *DuPont I*, the Court of Chancery considered in the first instance the constitutionality of a statute that purported to confer exclusive jurisdiction over actions for separate maintenance on the Family Court.  There, a

---

[39] *Id.* at 727.

[40] Donald Wolfe & Michael Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 2.02[b] (2024).

[41] Del. Const. of 1792, art. VI, § 14.

[42] 79 A.2d 680 (Del. Ch. 1951), *aff'd*, 85 A.2d 724 (Del. 1951).  In this opinion, we will refer to the Court of Chancery opinion as "*DuPont I*" and this Court's opinion as "*Dupont II*."

[43] 794 A.2d 579 (Del. 2001).

21

wife sued her husband in the Court of Chancery in two actions for separate maintenance in a proceeding that had no connection with a divorce action.[44] The husband moved to dismiss her actions, contending that the court had no jurisdiction to award such relief. He argued that the Court of Chancery never had jurisdiction over separate-maintenance proceedings, but, even if it did, the legislative act creating the Family Court for New Castle County—the Family Court Act—deprived it of jurisdiction.

The Court of Chancery concluded that the statute in question, by granting to the Family Court exclusive jurisdiction over support and maintenance actions, purported to deprive the Court of Chancery of jurisdiction in cases of the type the wife had filed in its court. But the nature of the new form of action in the Family Court varied in material respects from the separate maintenance action that was traditionally available in the Court of Chancery. Hence, under this Court's teaching in *Glanding v. Industrial Trust Co.*[45] that the Court of Chancery's "constitutional jurisdiction may be cut down only by the substitution of an adequate remedy in some other tribunal,"[46] the Court of Chancery focused on whether the Family Court's separate-maintenance remedy was adequate. The court determined that, for a

---

[44] The wife sought an award of separate support and maintenance alleging that she "was abandoned by her husband, without legal cause and that she [was] in destitute and necessitous circumstances." *DuPont I*, 79 A.2d at 680.

[45] 45 A.2d 553 (Del. 1945).

[46] *DuPont I*, 79 A.2d at 682.

22

number of reasons—including that the action in Family Court, which resembled a criminal prosecution, was controlled by the State and the wife could not appeal—the Family Court remedy was inadequate. The Court of Chancery therefore denied the husband's motion to dismiss, concluding that it had not been deprived of its jurisdiction.

The plot thickened on appeal when this Court "raised on its own motion a basic constitutional question . . . : Is the grant to the Court of Chancery by Section 10 of Article IV of the Constitution of 1897 of 'all the jurisdiction and powers vested by the laws of this state in the Court of Chancery' subject to unrestricted legislative curtailment by reason of the inclusion in Article IV of Sections 17 and 18?"[47]

Finding that § 18 "applies only to the powers of the office of Chancellor in contradistinction to the general equity powers of the Court of Chancery,"[48] the Court focused on § 17. That section provides, in relevant part, that "[t]he General Assembly, notwithstanding anything contained in this Article, shall have power to repeal or alter any Act of the General Assembly giving jurisdiction to . . . the Court of Chancery . . . [and that it] shall also have power to confer upon . . . the Court of Chancery jurisdiction and powers in addition to those hereinbefore mentioned . . . ."[49] After a careful analysis of the constitutional development of

---

[47] *Dupont II*, 85 A.2d at 726.
[48] *Id*. at 727.
[49] *Id.*

23

the Court of Chancery's equity jurisdiction, the *DuPont II* majority concluded that Article IV, § 17 "does not authorize the Legislature to alter, amend, or repeal any part of the jurisdiction of the Court of Chancery conferred upon it by Section 10 of Article IV of the Constitution."[50] But that jurisdiction, the Court made clear, is subject to the proviso that the Court of Chancery "shall not hear and determine any cause where a sufficient remedy exists at law."[51] Put another way, that proviso "is part of the constitutional grant of equity jurisdiction to the Court of Chancery."[52] In a passage Rutledge cites here with great emphasis, Justice Wolcott wrote:

> We conclude . . . that Section 17 is not an authorization to the Legislature to restrict Chancery jurisdiction to less than it was in 1792. We think the Constitutions of 1792, 1831 and 1897 intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity. They secured them for the relief of the people. This conclusion is in complete harmony with the underlying theory of written constitutions. Its result is to establish by the Judiciary Article of the Constitution the irreducible minimum of the judiciary. It secures for the protection of the people an adequate judicial system and removes it from the vagaries of legislative whim.[53]

---

[50] *Id.* at 730.
[51] *Id*. at 729.
[52] *Id.* at 730.
[53] *Id.* at 729.

The court then turned to the sufficiency of "the purportedly exclusive [spousal-maintenance] remedy"[54] in the Family Court and, finding it lacking, affirmed the decision of the Court of Chancery.[55]

While we commend to all who are interested in state constitutional law and the history of the Court of Chancery a reading of then-Vice Chancellor Seitz's opinion in *DuPont I* and Justice Wolcott's majority opinion and Justice Tunnell's dissent in *DuPont II*, we do not view the opinions as weighing against the constitutionality of SB 21. SB 21 does not operate like the statute creating the Family Court's purportedly exclusive jurisdiction in *DuPont I* and *II*. SB 21 does not divest the Court of Chancery of jurisdiction of any cause of action, nor does it direct any claim or category of claims to another court. Breach of fiduciary duty claims remain within the undisputed jurisdiction of the Court of Chancery. Indeed, Rutledge's claim itself remains within the Court of Chancery's jurisdiction, albeit subject to a review framework he finds unfavorable. Although the relief—equitable relief or damages—the Court of Chancery formerly would consider is now unavailable when it determines that a challenged transaction has been approved by one of the two statutorily designated cleansing mechanisms, SB 21 does not strip the

---

[54] *Id*. at 734.
[55] In dissent, Justice Tunnell voiced his view that "whether the substituted remedy is adequate or not is entirely for the judgment of the General Assembly, and this court's views as to its adequacy are unimportant." *Id*. at 735 (Tunnell, J., dissenting).

25

court of its jurisdiction over equitable claims. Instead, SB 21 represents, in our view, a legitimate exercise of the General Assembly's authority to enact substantive law that, in its legislative judgment, serves the interests of the citizens of our State.

Nor does *Arzuaga-Guevara* impel us to conclude otherwise. *Arzuaga-Guevara*[56] involved a guardianship proceeding in which the mother of a seriously injured four-month-old child petitioned the Court of Chancery to be appointed guardian for the purposes of consenting to or withholding the child's medical treatment. The child's father objected to the Court of Chancery's jurisdiction, arguing that three subsections of 10 *Del. C.* § 921 granted exclusive jurisdiction of such matters to the Family Court. The father contended that § 921 (3), (4), and (16) divested the Court of Chancery of subject matter jurisdiction despite the unambiguous grant of jurisdiction to the Court of Chancery to appoint guardians for disabled persons in 12 *Del. C.* §3901.[57] This Court made short work of the argument, noting that two of the subsections of § 921 cited by the father— subsections (3) and (4)—"did not grant the Family Court *any* jurisdiction to appoint guardians for minors."[58] And relying in part on the legislative synopsis of the bill in

---

[56] 794 A.2d 579 (Del. 2001).

[57] 12 *Del. C.* § 3901 provides that "[t]he Court of Chancery shall have the power to appoint guardians for the person or property, or both, of any person with a disability . . . . 'Person with a 'disability' means [among other things] any person who . . . [b]y reason of being under the age of 18 is legally unable to manage their own property or make decisions concerning the care of their own person . . . ." 12 *Del. C.* § 3901(a)(1)–(2).

[58] 794 A.2d at 583 (emphasis in original).

which subsection (16) originated, which expressly stated that the Family Court's jurisdiction was to be concurrent with that of the Court of Chancery, the Court determined that the Family Court's jurisdiction was not exclusive. In short, the Court's conclusion that 10 *Del. C.* § 921 did not divest the Court of Chancery of its equity jurisdiction was based on its interpretation of § 921 and not on constitutional principles.[59]

The other decisions Rutledge most frequently cites—*Schoon v. Smith*[60] and *CML V, LLC v. Bax*[61]—get us no closer to an answer to the first certified question. Both wrestle with the scope of derivative standing but neither addresses a legislative effort to divest the Court of Chancery of its equity jurisdiction.

The question here, at bottom, is not whether the General Assembly may eliminate a segment of the Court of Chancery's equity jurisdiction—jurisdiction that is time-honored and firmly grounded in our state constitution—without simultaneously establishing an adequate legal remedy in another tribunal. It may not. The question is whether Section 1 of SB 21 effects the result Rutledge claims that it does. We conclude that it does not.

---

[59] The Court did, however, engage in a thoughtful review of the history of the Court of Chancery's equity jurisdiction and *DuPont II*. But it did so in its consideration of the father's alternative argument that the existence of an adequate remedy at law in the Family Court precluded the Court of Chancery's assertion of guardianship jurisdiction.
[60] 953 A.2d 196 (Del. 2008).
[61] 28 A.3d 1037 (Del. 2011).

The cases addressed above, though not supportive in our view of Rutledge's argument, provide examples of what a divestiture of jurisdiction looks like. In *DuPont*, the husband's argument was that, by virtue of an act of the General Assembly, the Court of Chancery could no longer adjudicate separate maintenance actions brought by destitute spouses. That would divest the Court of Chancery of its equity jurisdiction without providing a remedy in another tribunal equivalent to the remedy available in the Court of Chancery. Thus, the argument was rejected. In *Arzuaga-Guevara*, the father asserted that 10 *Del. C.* § 921 took from the Court of Chancery its guardianship jurisdiction and gave it to the Family Court. The Court disposed of this argument as a matter of statutory interpretation. By contrast, SB 21 does none of the things that prompted courts in *DuPont* and *Arzuaga-Guevara* to sustain the Court of Chancery's jurisdiction.

G

When we look elsewhere, we find support for our conclusion that the General Assembly acted within its constitutional legislative authority when it enacted SB 21. In *Glassman v. Unocal Exploration Corp.*,[62] this Court considered "whether a minority stockholder may challenge a short-form merger by seeking equitable relief through an entire fairness claim."[63] The claim clashed with 8 *Del. C.* § 253, which

---

[62] 777 A.2d 242 (Del. 2001).
[63] *Id*. at 247.

28

authorizes a streamlined process for short-form mergers. The procedure, the Court noted, "is inconsistent with any reasonable notion of fair dealing[]"[64] for various reasons, including the absence of notice to the minority stockholders, director approval or a stockholder vote." The Court resolved the conflict "by giving effect to the intent of the General Assembly."[65] This holding in *Glassman* has remained undisturbed for a quarter century.[66]

*Glassman*'s deference to the General Assembly's authority to adopt DGCL provisions that shape the contours of equitable claims and affect the relief available in intra-corporate litigation is borne out by the DGCL's history. Exercising "[t]he legislative power of this State,"[67] the General Assembly enacted the DGCL in 1899. And, not surprisingly, the General Assembly has amended the DGCL, on occasion— as, in part, here—in response to judicial decisions. For instance, in the wake of *Smith v. Van Gorkom*[68] and a perceived directors and officers liability insurance crisis, the General Assembly enacted 8 *Del. C.* § 102(b)(7) allowing corporate charters to exculpate directors from personal liability in damages for due care violations. In a similar way, when this Court upheld the facial validity of fee-shifting bylaws in *ATP*

---

[64] *Id.*

[65] *Id.* at 248.

[66] Rutledge concedes that "*Glassman*'s holding likely cannot survive a ruling in [his] favor." Reply Br. at 17.

[67] Del. Const. art. II § 1.

[68] 488 A.2d 858 (Del. 1985) (holding that directors may be personally liable in money damages for gross negligence in the decision-making process).

29

*Tour, Inc. v. Deutscher Tennis Bund*,[69] the General Assembly amended 8 *Del. C.* §

102 by adding a new subparagraph (f), to prohibit "any [charter] provision that

would impose liability on a stockholder for the attorneys' fees or expenses of the

corporation or any other party in connection with an internal corporate claim . . . ."

In both these instances, the General Assembly acted in response to judicial decisions

by enacting statutes it believed served the best interests of the citizens of Delaware.

And in both, the legislative response affected how the Court of Chancery might,

absent the statutory enactment, exercise its equitable jurisdiction. As yet and so far

as we know, no one has mounted a constitutional challenge to § 102(b)(7) or §

102(f). But if we were to accept Rutledge's expansive reading of Article IV, § 10,

both would stand on constitutionally shaky ground. And other sections of the DGCL

would feel the shaking.

   We have already mentioned the short-form merger procedure authorized by 8

*Del. C.* § 253. As mentioned, Rutledge has acknowledged that Clearway and the

Governor are correct that *Glassman*'s holding that the intent of the General

Assembly as expressed in § 253 takes precedence over the Court of Chancery's

entire-fairness jurisprudence "likely cannot survive a ruling in [his] favor."[70] Other

---

[69] 91 A.3d 554 (Del. 2014).
[70] Reply Br. at 17.

30

sections whose constitutional footing would be threatened include § 122(17),[71] §

141(e),[72] § 174(a),[73] § 327,[74] and § 367.[75] And ironically enough, as Clearway

points out, "under [Rutledge's] theory, the pre-amendment-version of § 144 would

itself be unconstitutional.[76] After all, the pre-amendment version of § 144 prevented

the Court of Chancery from applying the common law principle that interested

transactions were entirely invalid.

To summarize, we conclude Rutledge has not met his burden of overcoming

the presumption of SB 21's constitutional validity. The General Assembly's

enactment of SB 21 falls within the "broad and ample sweep"[77] of its legislative

power.

## III

The second question asks whether Section 3 of SB 21, which provides that

amended § 144 will apply to "all acts and transactions, whether occurring before,

on, or after the enactment of [SB 21]," violates Article I, § 9 of the Constitution of

---

[71] 8 *Del. C.* § 122(17) (allowing corporations to renounce specific corporate opportunities, protecting fiduciaries from a breach of the duty of loyalty).
[72] 8 *Del. C.* § 141(e) (protecting directors from liability when they rely in good faith upon corporate records, information, opinions, and reports).
[73] 8 *Del. C.* § 174(a) (exonerating directors from liability if they record their dissent to unlawful dividend payments or stock purchases).
[74] 8 *Del. C.* § 327 (abrogating common law derivative standing by imposing a continuous stock-ownership requirement).
[75] 8 *Del. C.* § 367 (imposing a stock-ownership requirement for standing to bring an action against a public benefit corporation).
[76] Clearway's Answering Br. at 31.
[77] *Collison v. State ex rel. Green*, 2 A.2d 97, 101 (Del. 1938).

1897 by eliminating causes of action that already accrued or vested. [78]  Under Article I, § 9:

> All courts shall be open; and every individual for an injury done to the individual's reputation, person, or movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense.

We have interpreted Article I, § 9 to guarantee the same rights as are secured by the due process clauses of the Fifth and Fourteenth Amendments of the federal constitution.[79]  This guarantee protects citizens against "unreasonable and arbitrary deprivation of rights whether relating to life, liberty, property, or fundamental rights of action relating to person or property." [80]

Rutledge contends that he has a property right in his breach of fiduciary duty claim that had already accrued or vested before the General Assembly amended § 144.  He argues that the legislation strips him of his property right retroactively without the benefit of due process under Article I, § 9.  We disagree.

---

[78] D.I. 3.

[79] *Cheswold Volunteer Fire Co. v. Lambertson Const. Co.*, 489 A.2d 413, 416 n.5 ("The terms 'due course of law' and 'law of the land' in *Del. Const.* Art. I, § 9 are analogous to the term 'due process of law' in the Fourteenth Amendment."); *see also Opinion of the Justices*, 246 A.2d 90, 92 (Del. 1968) (The phrase "law of the land" has "substantially the same meaning as the due process clauses of the Fifth and Fourteenth Amendments of the Federal Constitution.").

[80] *Bailey v. Pennington*, 406 A.2d 44, 46–47 (Del. 1979) (quoting *Gallegher v. Davis*, 183 A. 620, 624 (Del. Super. Ct. 1936)).

A

Delaware law recognizes a presumption against the retroactive application of legislation.[81]  As we have stated, "[l]laws apply retroactively only where the General Assembly has made its intent plain and unambiguous."[82]  Here, the legislature was clear: amended § 144 is to apply to "all acts and transactions, whether occurring before, on or after" the date of enactment except for "any action or proceeding commenced in a court of competent jurisdiction that is completed or pending . . . on or before February 17, 2025."[83]

Such legislation is still subject to the test of due process.  Acts of the legislature "may not arbitrarily extinguish a right of action which redresses essential rights of person or property." [84]  Indeed, "a vested right of action is property just as tangible things are, and is protected from arbitrary legislation, apply[ing] to those rights of action which spring from contracts or the common law."[85]  But "[a] vested right is something more than a mere expectation based upon an anticipated continuance of the existing law."[86]

---

[81] *A.W. Financial Svs., S.A. v. Empire Resources, Inc.*, 981 A.2d 1114, 1120 (Del. 2009) (quoting *State ex. rel. Brady v. Pettinaro Enter.*, 870 A.2d 513, 529 (Del. Ch. 2005)).
[82] *Id.* (citations omitted).
[83] S.B. 21, 153d Gen. Assemb. § 3 (2025).
[84] *Cheswold*, 489 A.2d at 418 (citing *Gallegher*, 183 A. at 624).
[85] *Hazzard v. Alexander*, 173 A. 517, 519 (Del. Super. Ct. 1934).
[86] *Id.* at 518.

In *Cheswold Vol. Fire Co. v. Lambertson Constr. Co.*, a case that did not involve the retroactive application of a statute, the Court explained the principle in language Rutledge cites in support of his cause:

> While the Legislature remains free to limit or expunge common law rights, we are mindful that this power must be exercised in conformity with the dictates of due process. We are mindful, too, that the Legislature may not arbitrarily extinguish a right of action which redresses essential rights of person or property. Thus, while no one has a vested interest in a rule of the common law, due process preserves a right of action which has accrued or vested before the effective date of the statute.[87]

But contrary to what Rutledge contends, SB 21 does not extinguish his right of action. He may yet challenge the Clearway transaction based upon allegations that Clearway's CEO and majority stockholders breached their fiduciary duties. To be sure, the court must now review the challenged transaction under statutory standards that changed after the transaction closed but before Rutledge filed suit. It is highly questionable, however, that the statutory change effected the extinguishment of Rutledge's vested right. His interest, to the contrary, appears to be more "an anticipated continuance of the existing law" than a vested property right.

But even if we were to accept the proposition that SB 21 extinguished a vested right, it would still be incumbent on Rutledge to demonstrate that the General Assembly did not exercise its legislative authority in conformity with the dictates of

---

[87] *Cheswold*, 489 A.2d at 418 (internal citations omitted).

34

due process. As *Cheswold* makes clear, when a legislature limits or expunges common law rights, "the dictates of due process"[88] must be observed. We also recognized that "[w]hen reviewing economic legislation the due process guarantee of the Fourteenth Amendment [—the standard we apply to Article I, § 9—] requires that the statute bear a reasonable relation to a permissible legislative objective."[89] Given that the General Assembly has the constitutional authority to create and modify the general corporate law of Delaware, it seems evident to us that SB 21 is designed to further a permissible legislative objective.

## B

The other cases Rutledge cites in support of his argument against the retroactivity of SB 21 cannot bear the weight he asks them to carry. *Monacelli v. Grimes* concerned whether a change in the statutory substituted-service procedures that a plaintiff must follow to subject a non-resident defendant to *in personam* jurisdiction retroactively altered substantive rights.[90] The change in substituted-service procedure conferred upon the plaintiff "a legal right where none before existed."[91] Thus, we determined that the statutory revision "involve[d] the

---

[88] *Id.*

[89] *Id.*; *see also Town of Cheswold v. Central Del. Bus. Park*, 188 A.3d 810, 821 n.58 (Del. 2018) ("[A] statute may retroactively reach property rights which have vested and may create new obligations with respect thereto, provided that the statute is a valid exercise of police power." (quoting *Price v. All American Engineering Co.*, 320 A.2d 336, 340 (Del. 1974)).

[90] *Monacelli v. Grimes*, 99 A.2d 255, 258 (Del. 1953).

[91] *Id.* at 267 (quoting *Ashley v. Brown*, 151 S.E. 725, 727 (N.C. 1930)).

fundamental notion of due process of law and hence deal[t] with substantive rights."[92]  Amended § 144 operates quite differently; it may affect the standard of review, but it  does not affect a substantive right without due process.

Consistent with *Monacelli*, in *Rennick v. Glasgow Realty, Inc.*,[93] a premises liability case, the federal district court declined to retroactively apply an amended version of Delaware's Guest Premises Statute[94] because it would "impose a new duty upon defendants which did not exist at the time of the accident."[95]  In addition to that, the court "perceive[d] nothing which indicates a legislative intent that [the amended statute] be applied retroactively."[96]  These distinguishing factors drain *Rennick* of any persuasive force it may otherwise bring to bear.

Finally, in *A.W. Financial Services*,[97] this Court considered whether a 2008 amendment to the Delaware Escheat Statute would apply retroactively in civil actions involving stocks that were escheated prior to the amendment.  We answered "no," because "there [was] no expressed statutory intent, let alone one that is plain and unambiguous that the 2008 amendment have retroactive effect."[98]  The effect of the amendment, moreover, was to permit the State to divest a stockholder of a

---

[92] *Id.*
[93] 510 F. Supp. 638 (D. Del. 1981).
[94] 25 *Del. C.* § 1501.
[95] *Rennick*, 510 F. Supp. at 641.
[96] *Id*.
[97] 981 A.2d 1114.
[98] *Id*. at 1120.

Delaware corporation of a property right—ownership interest in the stock. Seen in this light, *A.W. Financial Services* is a poor fit for an analysis of amended § 144, which involves a clear statement of legislative intent, is supported by a legitimate legislative purpose, and does not wrest a vested property right from Rutledge's hands.

As with his challenge to § 1 of SB 21, Rutledge has not met his burden of overcoming the presumption that § 3 of SB 21 is constitutionally valid.

IV

We end where we began, answering both questions certified to us by the Court of Chancery in the negative. The provisions of SB 21 that Rutledge has challenged neither divest the Court of Chancery of its constitutionally derived equity jurisdiction nor do they impermissibly extinguish any discernible vested right asserted by Rutledge.